Robert L. STEELE, Petitioner-appellee,

v.

Terry D. TAYLOR, Supt.,
Respondent-appellant.

Owen J. KILBANE, Petitioner-appellee,

v.

Ronald C. MARSHALL, Supt.,
Respondent-appellant.

Martin A. KILBANE, Petitioner-appellee,

v.

Ronald C. MARSHALL, Supt.,
Respondent-appellant.

No. 81–3264.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 2, 1982.

Decided July 28, 1982.

Rehearing and Rehearing En Banc Denied
Nov. 11, 1982.

Simon B. Karas, Asst. Atty. Gen., Columbus, Ohio, Albin Lipold, Asst. Pros. Atty., Cuyahoga County, Cleveland, Ohio, for respondent-appellant.

Leonard W. Yelsky, Angelo F. Lonardo, Yelsky, Singer & Lonardo, Cleveland, Ohio, for Steele.

Ralph D. Sperli, Cleveland, Ohio, for O. J. Kilbane.

Mark R. Devan, Cleveland, Ohio, for M. Kilbane.

Before LIVELY and MERRITT, Circuit Judges, and TAYLOR,* District Judge.

MERRITT, Circuit Judge.

In this state habeas corpus, murder case from Ohio, a jury convicted a Cleveland municipal court judge and two other petitioners of hiring another to assassinate the judge's wife. The two principal constitutional questions on appeal arise under the confrontation clause of the sixth amendment[1] and the self-incrimination clause of the fifth amendment[2] which were made applicable to the states through the fourteenth amendment in *Pointer v. Texas*, 380

---

\* The Honorable Anna Diggs Taylor, District Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

1. The clause provides that "the accused shall enjoy the right ... to be confronted with the witnesses against him."

2. The clause provides that "no person ... shall be compelled in any criminal case to be a witness against himself."

U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), and *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The first question arises because a crucial witness for the state wrongfully refused to take the stand, was held in contempt but still refused to testify. Her prior, unsworn statement to the police incriminating the defendants was then admitted on grounds that defendants procured her unavailability. The second question arises because the defendants did not testify. In final argument defense counsel argued that "Mr. Robbins," the contract assassin named by the state, "didn't do it," and "you must acquit them, even if you think they did it through someone else." To this argument the prosecutor immediately responded that although "defendants contend they are not guilty, not one of them has said, 'we are innocent.'" The state trial court advised the jury to disregard the comment and issued clear, curative instructions in its final charge advising the jury that it should draw no inferences adverse to the defendants because they did not take the stand.

The main questions on appeal are: (1) Is the confrontation clause violated by a state rule of evidence admitting a prior, probative hearsay statement by a witness, whose unavailability was procured by the defendants, when the statement would have been admissible under a traditional hearsay exception had the witness taken the stand? (2) Did the prosecutor's comment, taken in light of the curative instructions, constitute an improper comment on the defendants' failure to take the stand requiring that defendants' convictions be vacated?

In an unreported opinion reviewing the findings and conclusions of the federal magistrate, the District Court issued the writs of habeas corpus holding that the two, claimed state trial errors described above violate the fifth and sixth amendments. For essentially the same reasons stated by state trial Judge Nahra in his opinion denying defendants' motion for new trial, *see State v. Kilbane*, 61 Ohio St.2d 201, 400 N.E.2d 386, 5 Ohio Opinions 3d 383 (1977), we conclude that no constitutional error occurred and, therefore, reverse. On the fifth amendment question we conclude that where, as here, a prosecutor's comment, in context, is open to two or more interpretations, only one of which would constitute an improper comment on the defendants' failure to take the stand, the possible constitutional error can be and was cured by clear instructions to the jury. On the more difficult confrontation clause question, we conclude that the state rule of evidence described above respecting a defendant's procurement of witness unavailability is constitutional and was constitutionally applied at the trial to the facts of the case by Judge Nahra.

I.

The evidence adduced at trial, taking the state's case in its strongest light, shows that Judge Robert Steele hired two brothers who were former clients, Owen and Martin Kilbane, to find a person to kill his wife, Marlene Steele. He had fallen in love with another woman whom he married three months after the murder; his wife would not consent to a divorce. The Kilbane brothers hired Rick Robbins, a contract assassin, who carried out the murder on January 9, 1969. He shot her at home in bed asleep at night while her two children and Steele were in the house. The police immediately suspected Steele but were unable to solve the case until seven years later when Carol Braun, the key witness who refused to testify at the trial, contacted FBI Agent Ressler. He and another agent interviewed her at length and took a signed statement. She said she had been a prostitute for Owen Kilbane for ten years and wanted to escape his control. In 1968 she meet Steele, Kilbane's lawyer. She had heard several conversations between Owen and Martin Kilbane, concerning their plans to carry out the murder for Steele. She learned before the murder that Robbins was to commit the crime, and immediately afterward Owen Kilbane told her how the crime had been carried out.

After this interview, Robbins was arrested and charged with another murder.

Upon conviction, he agreed to testify as to his part in the Steele murder in exchange for immunity from prosecution and protection for his family.

The state's evidence at the trial was strong. The motive was clearly established. A lawyer friend of Steele, David Lombardo, a man with no apparent motive to lie, testified that Steele told him three months before the murder that he was thinking about finding someone to kill his wife.[3] Robbins testified that he was hired by the Kilbane brothers acting for Steele. He testified concerning the details of the crime and how he was contacted and paid. He testified that he did not meet Steele until sometime after the murder. The only reference to the murder that ever passed between them came on one occasion when Steele winked at him and said simply "Good job."

In constructing its order of proof, the state viewed the testimony of Carol Braun as the major link in the chain stretching from Steele to Owen and Martin Kilbane to Robbins. Robbins' credibility was weak. Along with the motive and the testimony of Steele's lawyer friend, Braun would provide the corroboration the prosecutor thought was needed for the jury to believe Robbins' testimony.

The record reveals a strenuous tactical battle between the prosecution and defense counsel over the testimony of Carol Braun. Through a combination of tactics, the defense sought to prevent her testimony.

By the time of trial, Carol Braun was again living with Owen Kilbane and had given birth to a child. Fearful that Braun would not be available as a witness, the state placed her in protective custody. Owen Kilbane obtained a lawyer for her, and his own counsel also remained as Braun's co-counsel. All defense counsel contested protective custody and sought her release. The trial court released her from custody.

The state then sought to perpetuate her testimony by deposition. Braun's lawyer and the other defense counsel objected on grounds of the marital privilege. The court ordered her deposition taken on this issue. In that deposition, in addition to testimony concerning her relationship with Owen Kilbane, she stated that her previous statement to the FBI was false. The defense then sought to prevent her testimony at trial on the grounds that the deposition established the marital privilege, that she was entitled to refuse to testify under the fifth amendment, and that her previous statement was false. The court overruled these objections and ordered her to testify. Owen Kilbane's counsel advised the court that she would refuse to testify, even if held in contempt. After severe lectures from the bench on conflict of interest, Owen's lawyer withdrew as co-counsel for Braun. Braun's counsel appealed the court's ruling on the marital privilege.

At the trial, Braun was called over the objection of all defense counsel. Her lawyer—employed for her by Owen Kilbane—stated that she would not testify and acknowledged that he had counseled her to

---

3. Euclid City Prosecutor David Lombardo testified that sometime during the last week of September, or the first week of October, 1968, he visited Judge Steele to thank him for his assistance in Lombardo's appointment as Assistant Law Director of Euclid:

Q. What was the substance of that conversation? What did you say to him and what did you say to you?
A. Well, basically ... I thanked him for assisting me and I told him anything I can ever do for him in the future, I'd be happy to, because the consensus was that he was going to run for Mayor, and I offered him my assistance.
Q. And what happened then?

A. He said, "Do you think that Joe"—meaning my law partner—"that he could find somebody to kill my wife for me?"
Q. O.K. And what did you say?
A. I told him he was crazy, in so many words.

Q. Did he say anything else at that time?
A. There was more conversation along that line. I think I made some kind of remark trying to be funny, because I meant to treat it lightly, and as I was leaving, he said, "Don't laugh. Some morning you may pick up the paper and see she has had a tragic accident and you'll know what happened."
(Record at 1146–48.)

follow this course in view of the fact that the marital privilege question was on appeal. Braun refused to step forward and be sworn upon the court's order, was held in contempt and sentenced to six months in jail. After the prosecution moved that she be "forcibly brought before the jury . . . so they can see her presence, and be cross-examined, whether or not she is sworn," all defense counsel moved that she not be forced to take the stand before the jury.

The trial judge stated that, based on his observation of the witness, the evidence introduced in the case, and the course of events leading to the impasse, it was his opinion that the witness was under the control of the defendants who had procured her refusal to testify. Relying on *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878) (a defendant who procures the unavailability of a witness is not entitled to exercise his right of confrontation with respect to the witness),[4] the court ruled that "Miss Braun will be brought to the court and given an opportunity to testify" before the jury is seated. "If she refuses, her written statement may be introduced. Thereafter, she may be cross-examined by

any party." (Record at 3539–40) She refused to come into the courtroom voluntarily. Defense counsel for Steele and Martin Kilbane immediately requested that she be subpoenaed as their witness for cross-examination. Notified of the subpoenas, she still refused to enter the courtroom. Agent Ressler testified as to the content of her prior statement. He was cross-examined at length by defense counsel concerning her later retraction of the statement and the circumstances under which the statement was taken.

The Ohio Court of Appeals in a two to one, unreported decision upheld the defendants' convictions. The court ruled that Braun's prior statement was admissible under Ohio rules of evidence and under the confrontation clause because, although perhaps not admissible under any traditional exception to the hearsay rule, it falls within the broad exception found in Federal Rules of Evidence 804(b)(5) permitting a hearsay statement "not specifically covered by any . . . [traditional] exceptions but having equivalent circumstantial guarantees of trustworthiness."[5] The court also stated

---

4. The trial judge explained his ruling as follows:

The defense does not have to call any witnesses; but they cannot interfere with the witnesses called by the prosecution and then complain of the situation brought about by their interference. This proposition was forcefully set forth in *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878), wherein it was held:

"Although the Constitution declares that in all criminal prosecutions the accused shall enjoy the right to be confronted with the witnesses against him, yet if they were absent by his procurement, or when enough has been proved to cast upon him the burden of showing, and he, having full opportunity therefor, fails to show, that he has not been instrumental in concealing them or in keeping them away, he is in no condition to assert that his constitutional right has been violated by allowing competent evidence of the testimony which they gave on a previous trial between the United States and him upon the same issue. Such evidence is admissible."

In *Reynolds* the defendant refused to tell the United States Marshal where a witness, who lived with him, could be found for service of a subpoena, and on this basis the Court held that the defendant was in "no

condition to assert that his constitutional right had been violated."

400 N.E.2d 386, 5 Ohio Opinion 3d at 391–92.

5. The pertinent portion of Rule 804 reads as follows:

HEARSAY EXCEPTIONS: DECLARANT UNAVAILABLE

(a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant—

. . . . .

(2) persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so; . . . .

. . . . .

A declarant is not unavailable as a witness if his . . . refusal . . . is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . .

(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the

that the trial judge was probably correct in admitting the statement on grounds that the defendants caused the unavailability of the witness and should be held to have waived their rights to confront the witness but reserved a formal, definitive ruling on this question. The Ohio Supreme Court declined to review the case.

The District Court held that the Ohio courts had erred because Ohio law does not recognize section 804 and would not recognize the statements of the Kilbane brothers to Braun as within the co-conspirator exception to the hearsay rule. It further held that the statement lacks sufficient indicia of reliability to meet the confrontation standard established in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and that the state trial court did not have before it sufficient facts to justify its finding that the defendants caused the witness to be unavailable.

## II.

■ The word "witness" in the confrontation clause has normally been interpreted in its common law sense to include both a present witness whose words are heard in court and an absent witness whose words are recited as true.[6] But there is a major distinction between the two kinds of witnesses. English and American judges for good reason are traditionally unwilling in criminal cases to relax the hearsay rule under either the common law or the confrontation clause when a witness is available to testify. Our adversary system has a strong "*preference* for face to face accusation" and cross-examination and insists upon it when the witness is available. *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531,

2538, 65 L.Ed.2d 597 (1980) (emphasis added). When the witness is unavailable, however, adversary confrontation is impossible; and the courts are willing to relax the hearsay rules somewhat in order to insure a decision based on the relevant facts, depending on the reason for the witness's unavailability and the probative value and the circumstantial guarantees of trustworthiness surrounding the proffered statement.

■ The Supreme Court in both the majority and dissenting opinions in the *Roberts* case has recently outlined a "general approach" to the unavailability problem under the confrontation clause. In *Roberts* the witness was "unavailable" because she had moved to a different state, and the prosecution sought to introduce her prior testimony at a preliminary hearing. The dissenting view of Justices Brennan, Marshall and Stevens emphasized the reason for the witness's unavailability. They found the evidence inadmissible because the prosecution was at fault; it had not used sufficient diligence in securing the presence of the witness. Justice Blackmun's opinion for the Court also analyzes the reason for the witness's unavailability. He found no prosecutorial fault. Where neither party is responsible for the unavailability of the witness, a hearsay statement is admissible, the Court held, "if it bears adequate 'indicia of reliability,'" for example, "where the evidence falls within a firmly rooted hearsay exception." 448 U.S. at 66, 100 S.Ct. at 2539. Under this rule, both *Roberts* and cases from this Court indicate that when neither party is at fault respecting the unavailability of a witness, an uncross-examined extra-judicial statement by the witness to a police officer lacking other independent

court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

**6.** For a contrary view, later retracted, that the defendant is entitled to confront only the wit-

nesses called by the prosecution, see Justice Harlan's concurring opinions in *California v. Green*, 399 U.S. 149, 172–189, 90 S.Ct. 1930, 1942–1951, 26 L.Ed.2d 489 (1970) and *Dutton v. Evans*, 400 U.S. 74, 96, 91 S.Ct. 210, 223, 27 L.Ed.2d 213 (1970) discussed in Westen, "The Future of Confrontation," 77 Mich.L.Rev. 1185 (1979). *See also Ohio v. Roberts*, 448 U.S. 56, n.9 at 66–68, 100 S.Ct. 2531, n.9 at 2539–2540, 65 L.Ed.2d 597 (1980).

indicia of reliability does not justify "an exception to the requirement of full and effective cross-examination." *Mayes v. Sowders*, 621 F.2d 850, 856 (6th Cir.), *cert. denied*, 449 U.S. 922, 101 S.Ct. 324, 66 L.Ed.2d 151 (1980).

In the instant case, however, the state court found that the defendants bear a major responsibility for the unavailability of the witness. If those findings are accepted, that fact distinguishes the instant case from the facts in *Roberts* and *Mayes*.[7] Before addressing the question of the state court's findings of fact on procurement, we must consider how far the standard of reliability and trustworthiness should be relaxed when the defendants are at fault in causing the unavailability of the witness, as well as the standard of fault to be followed.

■ Employing either a concept of implicit waiver[8] of confrontation or the principle that a person should not profit by his own wrong, English and American courts have consistently relaxed the hearsay rule when the defendant wrongfully causes the witness's unavailability. The theory of the cases appears to be that the disclosure of relevant information at a public trial is a paramount interest, and any significant interference with that interest, other than by exercising a legal right to object at the trial itself, is a wrongful act. Wrongful conduct obviously includes the use of force and threats, but it has also been held to include persuasion and control by a defendant, the wrongful nondisclosure of information, and a defendant's direction to a witness to exercise the fifth amendment privilege.[9]

■ The evidence admitted as a result of such wrongful conduct includes uncross-examined statements such as grand jury testimony and prior extra-judicial statements, as well as cross-examined statements such as depositions and former testimony. The relevant cases are briefed in the accompanying footnote.[10]

7. Justice Blackmun's caveat in *Roberts* is relevant here. He said that "competing interests . . . may warrant dispensing with confrontation at trial" and further relaxing the hearsay rule in some cases depending on " 'considerations of public policy and the necessities of the case.' " 448 U.S. at 64, 100 S.Ct. at 2538 *quoting Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895).

8. It .should be noted that the "waiver" concept is not applicable, strictly speaking, to procurement, and its use is somewhat confusing. It is a legal fiction to say that a person who interferes with a witness thereby knowingly, intelligently and deliberately relinquishes his right to exclude hearsay. He simply does a wrongful act that has legal consequences that he may or may not foresee. The connection between the defendant's conduct and its legal consequence under the confrontation clause is supplied by the law and not by a purposeful decision by the defendant to forego a known constitutional right. But see *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982) holding that procurement of witness unavailability is a "waiver question."

9. See note 10, infra.

10. In *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878), the defendant refused to reveal the witness's location to a process server, and the Supreme Court approved admission of former trial testimony on a different charge, testimony not otherwise admissible, finding that the question of "procurement" is one of fact and stating that "the finding of the court below is, at least, to have the effect of a verdict of a jury upon a question of fact, and should not be disturbed unless the error is manifest." *Id.* at 159. In *Lord Morley's* case, 6 State Trials 770 (1666), the deposition of a youth who fled because of impending trial was not admitted because no reason for the flight was shown. The House of Lords held that the trial judge's finding that the evidence was not enough to show "procurement" was a finding of fact binding on appeal. In *Harrison's* case, 12 State Trials 851 (1692), the defendant attempted to bribe or "spirit away" two witnesses. The deposition of both before a coroner was admitted though the account of the bribe was itself hearsay and the disappearance of the other witness was not directly connected to the defendant. The Court of Common Pleas apparently drew an inference from the bribe that the disappearance was caused by the defendant. In *Regina v. Scaife*, 117 Rev.Rep. 1271 (Q.B.1851), the court upheld the trial judge's finding that the evidence showed "contrivance to keep the witness out of the way" and a deposition not otherwise admissible was allowed. In *Tolbert v. Jago*, 607 F.2d 753 (6th Cir. 1979), *cert. denied*, 444 U.S. 1022, 100 S.Ct. 682, 62 L.Ed.2d 655 (1980), *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982), *United States v. Balano*, 618 F.2d 624 (10th Cir. 1979), *cert. denied*, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980), and *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976), *cert. denied, sub nom Hofstad*

**1202**

Our research has disclosed no case in which a court upon a finding of wrongful conduct has declined to admit prior statements that would have come in had the witness taken the stand. Neither has our research disclosed a case finding that a defendant wrongfully causes a witness's unavailability by exercising the right at trial to object to the presence, capacity or testimony of the witness.

■ From these cases we derive essentially the same rule as the one stated by the state trial judge: A prior statement given by a witness made unavailable by the wrongful conduct of a party is admissible against the party if the statement would have been admissible had the witness testified. The rule, as Judge Nahra said, is based on a public policy protecting the integrity of the adversary process by deterring litigants from acting on strong incentives to prevent the testimony of an adverse witness. The rule is also based on a principle of reciprocity similar to the equitable doctrine of "clean hands." The law prefers live testimony over hearsay, a preference designed to protect everyone, particularly the defendant. A defendant cannot prefer the law's preference and profit from it, as the Supreme Court said in *Reynolds*,[11] while repudiating that preference by creating the condition that prevents it.

■ The next question that arises is whether the confrontation clause should be interpreted to allocate a particular burden of persuasion on the question of procurement and, if so, how is it to be measured? Traditionally the common law has left findings of preliminary fact necessary to an admissibility ruling to the trial judge without close supervision. The Federal Rule of Evidence 104(a) reflects that view; it states

that the trial judge "is not bound by the rules of evidence" in making such determinations. Nevertheless, in federal criminal cases, courts in similar situations have imposed minimum rules. *See United States v. Enright*, 579 F.2d 980 (6th Cir. 1978) (preponderance standard appropriate on findings triggering the co-conspirator hearsay exception) *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982) (clear and convincing standard required to find procurement of witness unavailability in federal criminal case).

■ In *Reynolds*, the Supreme Court suggested that the public interest in securing testimony is sufficiently strong that "enough had been shown [by the government] to cast the burden of proof on him [the defendant] of showing that he had not been instrumental in concealing or keeping the witness away." 98 U.S. 160. Judge Nahra expressly followed this standard. We interpret this standard to mean that the proponent of the hearsay statement has the burden of persuasion of showing procurement by a preponderance, but once evidence is produced that demonstrates good reason to believe the defendant has interfered with the witness, adverse inferences may be drawn from the failure of the defense to offer credible evidence to the contrary. A standard that requires the proponent to show that it is more probable than not that the defendant procured the unavailability of the witness is constitutionally sufficient under the due process and confrontation clauses.

■ Our Court has developed such a preponderance standard for trial judges in making preliminary findings of fact on the admissibility of extra-judicial statements under the co-conspirator exception. *United*

*v. United States*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), the evidence, including reasonable inferences therefrom, indicated that the defendant, or one acting for the defendant, had either threatened or murdered a witness in order to prevent his testimony, and the courts approved the admission of either the witness's grand jury testimony or a prior statement to the police. In *United States v. Mayes*, 512 F.2d 637 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95

S.Ct. 2629, 45 L.Ed.2d 670 (1975), the defendant pressed and persuaded the witness to assert his fifth amendment privilege, and this Court approved the reading of portions of a prior statement. There are a number of state cases to the same effect. *See e.g., State v. Hansen*, 312 N.W.2d 96 (Minn.1981), and the cases discussed therein.

11. *See* note 4, *supra*.

*States v. Enright*, 579 F.2d 980 (6th Cir. 1978). Since the question of admissibility of such statements under the co-conspirator exception is equivalent to a ruling on their admissibility under the confrontation clause, *see generally United States v. Nixon*, 418 U.S. 683, 700–01, 94 S.Ct. 3090, 3103–3104, 41 L.Ed.2d 1039 (1974); *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), we see no logical reason to impose a higher standard on the states in making preliminary findings on procurement in connection with rulings on the admissibility of similar extra-judicial statements.

██ Keeping in mind the statutory requirement, 28 U.S.C. § 2254(d) (1976), that this Court accord "the presumption of correctness" to findings of a state court upon habeas corpus review, *see Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), we proceed to apply these principles to the findings of the state court. In making findings of fact preliminary to its ruling on the admissibility of the prior statement, the state court was entitled to consider, and stated that it did consider, all the facts of the case already in evidence and the course of conduct of the defendants in seeking to prevent the witness's testimony before and during the trial. From this evidence, the court could reasonably find that the state had made out a prima facie case at the time the witness's statement was offered that the defendants conspired together to commit the crime charged and to escape detection, that they had a close personal relationship with each other and that their repeated objections indicated a strong desire to prevent the witness from testifying. It was not unreasonable for the court to infer, in light of the defendants' previous concerted activities to conceal the crime and their efforts to prevent the witness's testimony, that they jointly planned a strategy to prevent her testimony in order to escape conviction and that they agreed that Owen Kilbane would use his influence and control over her to induce her not to testify. Although there is no evidence in the case of specific threats, there is evidence supporting the inference that Braun was afraid of Kilbane. There is also evidence that Kilbane obtained her lawyer and that the lawyer advised her to refuse to testify and to place herself in contempt. The fact that defense counsel revised their tactics after the court's ruling and issued subpoenas for the witness does not alter the fact that all of the facts preponderated in favor of a concerted plan to induce the witness not to testify. Thus we cannot say that the state court committed constitutional error by inferring from the facts before it that the defendants acting in concert wrongfully induced Braun not to testify. Indeed, as the state judge said, one would have to be "blind" to reality to reach a contrary conclusion.

██ It is clear that the incriminating evidence contained in the statement would have been admissible under the confrontation clause had Braun taken the stand. The state had made out a prima facie case of conspiracy. The incriminating statements of the Kilbane brothers to Braun and to each other in her presence came during the pendency of the conspiracy and are within the co-conspirator exception to the hearsay rule. If Braun had taken the stand and denied the facts contained in the statement, the statement would have been admissible under the confrontation clause as a prior inconsistent statement. *See California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (prior inconsistent statement admissible as substantive evidence where witness testifies); *State v. Dick*, 27 Ohio St.2d 162, 271 N.E.2d 797 (1970) (prior inconsistent statement admissible for impeachment but not as substantive evidence). *See also United States v. Enright, supra*, for a discussion of the admissibility of a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

Although it is questionable whether Braun's statement is admissible under the confrontation clause in the absence of a finding that the defendants wrongfully caused the witness's unavailability, we note, as did the Ohio courts, that the statement

has indicia of reliability in addition to those required for the admissibility of prior inconsistent statements. It is a voluntary statement initiated by Braun, signed after several hours of questioning by FBI agents. It is true that at the time it was given Braun was hostile toward Owen Kilbane and perhaps in a mentally unstable condition. The statement, however, is very close to a traditional exception to the hearsay rule for "statements against interest." Such statements are permitted against a criminal defendant without regard to a finding that the defendant produced the witness's unavailability. Braun's statement recounts a life of prostitution and the concealment of a murder plot. Indeed, the witness invoked the privilege against self-incrimination as a basis for her refusal to testify. The indicia of reliability for such statements is the assumption that individuals do not make statements which are damaging to themselves unless satisfied that they are true. *See Hileman v. Northwest Engineering Co.*, 346 F.2d 668 (6th Cir. 1965) and Fed.R. of Evid. 804(b)(4) and the advisory committee notes thereto. We conclude, as did the state court, that the guarantees of trustworthiness surrounding the Braun statement are similar in terms of reliability to the traditional hearsay exception for statements against interest.

For these reasons we agree with the state trial judge that admission of the Braun statement did not violate the confrontation clause.

### III.

During closing argument, counsel for Steele made the argument to the jury that even if the jury believed that the defendants had conspired to kill Steele's wife, the jury must acquit because the state's case depended on establishing Robbins rather than "someone else" as the murderer, and the defendants had proved that Robbins did not commit the murder. The prosecution's response was to quote defense counsel and then to comment, as follows:

12. "A defendant in a criminal case, ladies and gentlemen, has a Constitutional right not to testify. No inference is to be drawn by you

When Mr. Yelsky [counsel for Steele] closed his final argument, I'm going to quote what he said.

"You might not like these Defendants because of some of their characteristics, but this is not a popularity contest. Whether you like me or them, or whether I like you isn't the issue. Mr. Robbins didn't do it. You must acquit them, even if you think they did it through someone else."

Isn't that a statement? It came from Mr. Yelsky's lips. "Mr. Robbins didn't do it. You must acquit them, even if you think they did it through someone else."

The defendants contend that they are not guilty. Not one of them has said, "We are innocent." (Record at 4313–14)

Upon objection by defense counsel, the trial judge gave the following instruction: "The jury will disregard the remark of counsel. There has been a plea of not guilty entered by each defendant in this case." Then in his final charge to the jury, quoted below,[12] the trial judge properly instructed the jury respecting a defendant's right not to testify. The District Court held that the prosecutor's improper comment on the defendant's failure to take the stand constituted an independent ground for granting the writ under the doctrine of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

As Judge Jones recently wrote for this Court, a prosecutorial statement should be interpreted as a comment on the defendant's failure to take the stand when "the prosecutor's manifest intent was to comment on the accused's failure to testify" or when "the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981). Manifest intent will not be found "if some other explanation for his remark is equally plausible." *Id.* In *Butler v. Rose*, (No. 80–1415, June ——, 1982), this Court,

from the fact that Defendant exercises such right." (Record at 4374)

sitting en banc, considered whether a prosecutor's statement that the defense could not legitimately attack the state's key witness without putting one witness on to rebut her testimony was reversible error. Judge Lively, writing for the majority, analyzed relevant cases and concluded that the remark was not impermissible under *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), but that if it were erroneous the error was cured by clear instructions to the jury.

One interpretation of the prosecutor's comment here is that he intended to comment on the failure of the defendants to take the stand. The other interpretation is that the prosecutor was saying that defense counsel does not claim the defendants are innocent but rather that they cannot be convicted because they committed the crime in a different way than the state asserts. The prosecutor's error was that he put it in terms of what the defendants, rather than defense counsel, did not say.[13]

In order for the prosecutor's comment in this case to have affected the verdict of the jury, two inferences must be made: first, the jury understood the comment as a reference to the defendant's failure to take the stand; secondly, the jury inferred guilt from this fact. Assuming these inferences, we must assume that the jury disregarded the court's instructions or that the comment was so prejudicial that no instruction could cleanse its effect from the jury's mind.[14]

In *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), and *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Supreme Court declined to apply the rule of *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) retroactively on grounds that the rule against improper comment on the defendant's failure to take the stand is primarily designed to preserve the integrity of the judicial system. 382 U.S. at 414–15, 86 S.Ct. at 464. We do not think the prosecutor's comment in context was sufficiently egregious to affect the integrity of the adversary process or affect the jury's deliberations.[15] The comment immediately followed a direct quotation of the closing argument of defense counsel, and under one interpretation is directly responsive to those comments. We conclude that where, in context, a prosecutor's comment is reasonably subject to an interpretation other than as a comment on the defendant's failure to take the stand, clear curative instructions will ordinarily eliminate the error. Here defense counsel in voir dire asked the jurors if they could avoid making any adverse inferences against the defendants if they should not take the stand. The jury understood this obligation from the outset. At the end of the case the jury was given a clear "no adverse inference" instruction in the final charge. This instruction was repeated along with the rest of the charge a second time by request of the jury.[16] Under these circumstances, we find, as did the state trial and appellate courts, that the

13. A prosecutorial comment which clearly refers to the "silence" of defense counsel rather than the defendant's silence is not error. *Hollbrook v. United States,* 441 F.2d 371, 373 (6th Cir. 1971).

14. This is not a case where a judge's instruction has "solemnized" defendant's silence into evidence against him. *Cf. Griffin v. California.* Constitutionally defective instructions impose an improper framework for the evaluation of all evidence and can virtually never be harmless. *See Sandstrom v. Montana,* 442 U.S. 510 at 526–27, 99 S.Ct. 2450 at 2460, 61 L.Ed.2d 39 (1979) and cases cited therein.

15. In tailoring a proper remedy, this Court must look to the constitutional dimension of

both the error *and* its effect. To hold otherwise would be to deviate from "the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe upon competing interests." *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981).

16. We have no basis for presuming that a jury does not follow a judge's instructions. Studies indicate the opposite. *See* Traynor, The Riddle of Harmless Error (1970) at 73–74, citing H. Kalven, Jr. & H. Zeisel, The American Jury (1966).

probabilities are that the prosecutor's error was harmless beyond a reasonable doubt.

### IV.

■ Petitioners raised in the court below, and have briefed on appeal, two other federal claims. These issues are that the admission of a redacted tape recording of police interviews with Robert Steele (Record at 3102, 3112–14) and the admission of FBI summaries of two telephone interviews with Carol Braun (Exhibits 42 and 43; App. Vol. I at 80–84) violate due process because the Steele tape refers to Owen Kilbane as a "pimp" and the FBI summaries include references by Carol Braun to crimes committed by Owen Kilbane other than the murder of Steele's wife. These issues have not been exhausted in state court. It is plain from the record and the opinion of the Ohio Court of Appeals that these issues were presented to the state courts only as state evidentiary errors, not as federal claims. (See App.Vol. II at 11, 56–59, 117 for a statement of these claims as presented to the Ohio Court of Appeals.) Both the majority and dissenting opinions in the Ohio Court of Appeals quote the assignments of error in that court regarding these claims; no federal claim was asserted or decided.[17] Therefore, to the extent that the District Court based its decision below and the issuance of a writ of habeas corpus on these two unexhausted claims, it was without jurisdiction to do so, and its decision must be reversed.

■ The state has not asserted that the entire habeas corpus petition should be dismissed because it presents a mixture of exhausted and unexhausted claims, see *Rose v. Lundy,* —— U.S. ——, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). In view of the time and effort already invested in the case

by the parties, the court below and the state courts, and the fact that the writ has already issued, we are not inclined to dismiss the appeal and the petition at this time under *Rose v. Lundy.* No party has raised the *Rose v. Lundy* issue, and we deemed the objection to have been waived in the court below. To dismiss the entire case at this point would cause an unnecessary delay in resolving the issues and would waste judicial resources.

Accordingly, the judgment of the District Court is reversed and the writ of habeas corpus issued to Ohio authorities is hereby vacated and set aside.

ANNA DIGGS TAYLOR, District Judge, dissenting.

I must dissent, and do so for all of the reasons so well stated in the opinion of District Judge George W. White, as well as in the dissent of Judge Jackson of the Ohio Court of Appeals. I am most concerned, however, that the defendants in this prosecution were deprived of the right which the Sixth Amendment of the United States Constitution guaranteed them when it stated:

> In all criminal prosecutions the accused shall enjoy the right ... to be confronted with the witnesses against him.

That right was held to apply to the states through the Fourteenth Amendment in *Pointer v. State of Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The constitutional error which has occurred here was not harmless, as the evidence of guilt was far from overwhelming. Indeed, the trial court itself wrote of the hearsay statements here in question in his denial of defendants' requests for a new trial, that this evidence was "more probative than any other evidence which the proponents [i.e.

---

**17.** The defendants further frame these claims as state evidentiary issues in their memoranda seeking review by the Ohio Supreme Court. For example, Martin Kilbane sought review of the proposition that:

> The trial court's admission into evidence of testimony and exhibits relating to crimes that this appellant had been investigated for and to a co-defendant's alleged involvement in

prostitution and other crimes as "other acts" tending to show motive, scheme or plan to commit murder under O.R.C. § 2945.59 constituted a prejudicial abuse of discretion. Petitioner's Memorandum in Support of Jurisdiction, *State v. Martin Kilbane,* Record, Vol. 2 at 27. *See also* Memorandum in Support of Jurisdiction, *State v. Owen Kilbane,* Record, Vol. 3 at 36.

the State] could procure through reasonable efforts . . . ."

It should be understood clearly that the testimony which has convicted these individuals was not mere hearsay, but was *double hearsay*. That is, FBI Agent Ressler testified that Carol Braun had once told him (but later denied) that she had heard statements made by each of these three defendants, either before or after the Steele murder, which tended to incriminate them variously. The Braun statements were not concerning her personal observations, nor did they involve or incriminate her in any way. Agent Ressler said that she had said that she had overheard the two Kilbanes allegedly conspiring to murder Marlene Steele. Ressler also said that she had said that Owen Kilbane had, essentially, "confessed" his participation in the murder conspiracy to her subsequently, and had also told her of the roles of defendant Steele and State's witness Robbins in the plot. Finally, Agent Ressler said that Braun had said that Steele and Owen Kilbane had instructed her to tell the police nothing, when an investigation had commenced.

Even if Carol Braun had testified at these defendants' trial, and if severance had been denied as it was in actuality, the "confession" of Owen Kilbane to Braun would have violated the confrontation rights of defendants Steele and Martin Kilbane, at the least. See *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Moreover, I fail to see why that problem has disappeared, in the present context.

But Carol Braun did not testify and there has been no contention that she was a co-conspirator of these defendants, making statements during the pendency of and in furtherance of a conspiracy. Indeed, it cannot be fairly argued that any of the defendants' alleged statements to her even fell within those parameters. Accordingly, Agent Ressler's testimony as to what Braun said the defendants said to her was the purest of doubly attenuated hearsay, and a gross deprivation of their constitutional right to confront their accusers.

Secondly, those "circumstantial guarantees of trustworthiness" which federal courts may utilize, *ad hoc*, to except a clearly reliable statement from the hearsay rule under Federal Rule of Evidence 804(b)(5) were not only unrecognized in Ohio law at the time of trial, but were and still are utterly nonexistent in this case. Every fact and circumstance in evidence concerning the making of the Braun declarations cries out for an opportunity to cross-examine. The declarations were not in the least respect against any legally recognized interest of the declarant, though they might tarnish a reputation in some circles. Braun had a clear and acknowledged motive to falsify at the time. She had just left Owen Kilbane "once and for all" in 1975, and had called Agent Ressler to advise that she was prepared to give evidence against Owen because she wanted to "put him away", with her accusation of an alleged five-year-old crime. There was nothing spontaneous about the statements. She sought Ressler's help to achieve revenge against her estranged lover. She asked Ressler to show her pictures, give her some names, and hints, and she would be able to recall Owen's criminal acts for Ressler to prosecute.

Finally, the "trustworthiness" of those accusations is completely undone by their recantation before Agent Ressler had passed them on to the jury. Carol Braun had told him, before trial, that these statements were all false, and that she had lied, been drunk, been on drugs, and been insane when she made them. She had long since gone back to Owen Kilbane, and they were the parents of a newborn baby.

The majority here, like the Ohio trial court, has further found that all defendants waived such right to confrontation as is acknowledged to be applicable, by "procuring" the unavailability of Carol Braun. On that issue I first must note that defendants Martin Kilbane and Steele asked leave of the trial court to subpoena her for cross examination on Ressler's statement, and were denied that leave. There is, the Trial Judge acknowledged, "no proof" that de-

fendants Martin Kilbane and Steele participated in any effort to procure Braun's refusal to testify, but inasmuch as all three defendants were "united in interest and effort", he attributed the waiver found against Owen Kilbane to all three.

And as to the facts upon which Owen Kilbane's "procurement" and "manipulation" of her refusal were found: those are the identical facts which the Trial court had just found insufficient to support a claim of commonlaw marriage. That is, they included the fact that the parties had exchanged commonlaw vows in 1967 and again before trial, that Braun used Kilbane's name, lived with him, had just given birth to his child within weeks of trial, and that "she was dependent upon him for food and shelter for herself and her child." On those facts the Trial court jailed Braun for six months for claiming wifehood and refusing to testify. Then, without holding any further evidentiary hearing whatsoever, the trial court held that a wrongful procurement of the unavailability of the witness by the defendants had been established, resulting in waiver of their Sixth Amendment rights. These conclusions appear to flow from the trial court's finding, repeated by this majority, that the Braun/Kilbane relationship was not that of husband and wife, but that of pimp and prostitute. If that latter relationship is a status recognized in the law, the question remaining to be answered is how, definitionally, one precludes the other.

The standards of *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878) for a finding of waiver of the right to confrontation by procuring the unavailability of a witness have not been met here. No evidentiary hearing was ever had, and not one fact other than the "marital" character of the Braun/Kilbane relationship has been cited to support the finding.

Finally, the "manipulation and procurement" analysis appears to be based upon the assumption that Braun's testimony would have been expected to be less favorable to defendants than was the inevitable result of her refusal to testify. The trial court had announced in a written opinion that if Braun again refused to testify, her statements to Ressler would be introduced. If she had testified, surely her recantation from the stand of her prior statements to Ressler would have been more clearly etched upon the minds of the jurors than it ultimately was, as a footnote to Ressler's testimony. If this matter is to be decided by suppositions, I will here insert my supposition that defendants would have preferred her testimony to Ressler's, after entry of that final order, and that any feasible "manipulation" would have brought her forward at that time.

Braun's reasons for not testifying were doubtless complex, but there is no evidence whatsoever that they were anything other than personal, and her own.

I would affirm Judge White in all respects.