**UNITED STATES of America**

v.

**John HOULIHAN, Michael Fitzgerald, William Herd, and Joseph Nardone, Defendants.**

**Crim. No. 93–10291–WGY.**

United States District Court, D. Massachusetts.

May 4, 1995.

---

John C. McBride, McBride, Wheeler & Widegren, Richard M. Egbert, Law Office of Richard Egbert, Boston, MA, for defendant John Houlihan.

Denis M. King, Goulston & Storrs, John F. Herlihy, Michael J. Liston, Glass, Seigle & Liston, Frank Mondano, Balliro & Mondano, Boston, MA, for defendant Alan Skinner.

Charles A. Clifford, Law Offices of Charles A. Clifford, Charlestown, MA, for defendants Joseph Houlihan, John Doherty.

Melvin Ravech, Ravech, Aronson, Shuman & Lewis, Boston, MA, for defendant Jennierose Lynch.

AnneMarie Hassett, Federal Defender Office, Boston, MA, for defendant Thomasina Brennan.

Robert Y. Murray, Ramsey, Murray & Jenkins, Boston, MA, for defendant Michael Fitzgerald.

Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA, for defendant Joseph Nardone.

Walter B. Prince, Peckham, Lobel, Casey, Prince & Tye, Leslie Feldman–Rumpler, Fitch, Wiley, Richlin & Tourse, P.C., Boston, MA, for defendant Robert Allen.

Michael C. Bourbeau, Boston, MA, for defendant Ellen Houlihan.

Charles W. Rankin, Rankin & Sultan, Boston, MA, for defendant William R. Hurd.

Kevin J. O'Dea, Boston, MA, for defendant Kevin Haugh.

James E. Costello, East Boston, MA, for defendant Brian Davis.

Keith S. Halpern, Boston, MA, for defendant John Houlihan, Jr.

George W. Vien, U.S. Attys. Office, OC-DETF Div., Crim., Frank A. Libby, Jr., Richard L. Hoffman, Paul V. Kelly, Antoinette E.M. Leoney, U.S. Attys. Office, Boston, MA, for U.S.

## MEMORANDUM

YOUNG, District Judge.

Once again,[1] this complex criminal case has presented an issue of first impression in the First Circuit, namely whether a defendant who causes the absence from trial of a potential witness against him has waived the right to object on Confrontation Clause and hearsay grounds to the admission of the witness' prior out-of-court statements. More specifically, this Court here explains what standard of proof it applied in resolving preliminary questions concerning the admissibility of such hearsay evidence under a waiver theory; what state of mind, if any, the government was required to prove as to each defendant to support such a waiver theory; and whether hearsay statements can be admitted not only for the purpose of proving the factual matters asserted, but also as circumstantial evidence—i.e., that the decedent was "ratting" to the police—in support of the charge of murdering the out-of-court declarant himself. Because this Court determined that the answers to these questions favored admissibility in this case, the Court here explains what evidence it admitted out of a melange of factual assertions, opinions, and street rumors. Finally—and perhaps most intriguing of all—having determined to admit redacted portions of these hearsay statements, the Court explains to what use it allowed the defendants to put the portions of the statements the Court ordered redacted.

## I. BACKGROUND

This case involves the prosecution of twelve defendants alleged to be members of a ruthless cocaine trafficking enterprise. The defendants, or certain of them, were charged in a forty-eight count indictment with distribution of cocaine, conspiracy to distribute cocaine, engaging in a racketeering enterprise, racketeering conspiracy, three murders in furtherance of a racketeering enterprise, conspiracy to commit murder in furtherance of a racketeering enterprise, four attempted murders in furtherance of a racketeering enterprise, using firearms in relation to a federal crime of violence, engaging in a continuing criminal enterprise, and criminal forfeiture.[2] Three of the defendants—John

1. In an earlier opinion on an issue not yet decided in this circuit, this Court ruled that statements made by a victim on the eve of his murder that he was going to meet one of the defendants were statements of then present intention, FED.R.EVID. 803(3), and, as such, were admissible not only to prove that the victim acted in conformity with his intention, but were also admissible on the issue of whether he actually met with one of the defendants. *See United States v. Houlihan*, 871 F.Supp. 1495 (D.Mass.1994).

2. Of the twelve original defendants, one—Joseph Houlihan—pleaded guilty prior to trial. Five defendants were severed. Two others—Allan Skinner and Jennierose Lynch—pleaded guilty

Houlihan ("Houlihan"), Michael Fitzgerald ("Fitzgerald"), and Joseph Nardone ("Nardone")—were charged, *inter alia*, with murder in aid of racketeering for the homicide of George Sargent ("Sargent"), an alleged foot-soldier in the so-called criminal enterprise who, at the time of his murder, was cooperating with law enforcement authorities.[3]

The government alleged that, prior to his death, Sargent told law enforcement officers that he was a street distributer for a Charlestown narcotics ring allegedly run by Houlihan and Fitzgerald. In his conversations with police, Sargent described the structure of the Houlihan–Fitzgerald cocaine operation, his role in the organization, and how he became involved.[4] Moreover, according to the government, Sargent made statements that inculpated Fitzgerald and Houlihan in the murder of James Boyden III ("Boyden Sr."), and which inculpated Fitzgerald in the murder of James Boyden IV ("Boyden Jr."), and the attempted murder of William "Bud" Sweeney ("Sweeney"). Sargent further made statements that indicated he feared Houlihan might want him killed, and told the police that in an attempt to protect himself he had stressed to Houlihan that he was "on his side."

On June 28, 1992, George Sargent was killed by multiple gunshot wounds. The government alleged that Houlihan and Fitzgerald ordered Nardone to commit the murder because, among other things, they feared that Sargent was talking to the police about Houlihan and Fitzgerald's criminal conduct.

Prior to the commencement of the proceedings, the government moved *in limine* to introduce at trial Sargent's statements to the police[5] despite the fact that Sargent was obviously unable to take the stand and therefore could not be subject to cross-examination by the defense. In support of the motion, the government argued that by murdering Sargent for the purpose of preventing him from cooperating with law enforcement authorities, Fitzgerald, Houlihan, and Nardone waived their rights to object to the admission of Sargent's out-of-court declarations. The government explained that, if admitted, Sargent's prior statements would be used to prove Fitzgerald's involvement in the murders of Boyden Jr., Boyden Sr., and Sargent himself, as well as his involvement in the conspiracy to distribute cocaine and in a continuing criminal enterprise; to prove Houlihan's involvement in the murders of Sargent and Boyden Sr., and his involvement in the drug conspiracy and in the continuing criminal enterprise; and as proof that Nardone killed Sargent and Boyden Sr. in aid of racketeering upon orders from Houlihan and Fitzgerald.

The Court deferred a determination of the issue until the government had presented the great bulk of its case so that the Court could make its decision upon a complete trial record and after extensive oral argument.[6] On January 23, 1995, this Court heard argument

---

after fifty days of trial. The failure of the Court further to sever and break apart this complex indictment into more digestible trials, *see e.g.,* *United States v. Casamento,* 887 F.2d 1141, 1152 (2d Cir.1989) (establishing a presumption that where the prosecution's case against multiple defendants will take more than four months severance is desirable); *United States v. Andrews,* 754 F.Supp. 1161, 1172 (N.D.Ill.1990), warrants a separate memorandum.

3.  According to the government, on March 6, 1992, the Massachusetts State Police executed a search warrant at 184 Bunker Hill Street, Apartment 2, in Charlestown—George Sargent's apartment. During the course of the search, the police seized large amounts of cocaine. Sargent was arrested and charged with trafficking in cocaine. Under questioning from law enforcement officials, Sargent voluntarily made the statements to the police which are at issue here.

4.  Sargent explained to the police that he owed a sizeable gambling debt to North End "bookies" which Fitzgerald agreed to assume. In return, Sargent agreed to sell cocaine for Houlihan and Fitzgerald until his debt to Fitzgerald could be repaid.

5.  Specifically, the government proposed to introduce the testimony of Police Trooper Mark Lemieux ("Lemieux") relaying statements made by Sargent to Lemieux on March 6, 1992, and a redacted version of a tape recording of an interview of Sargent conducted by Boston Police detectives on May 30, 1992.

6.  Houlihan, Fitzgerald, and Nardone argued that this procedure was nonetheless inadequate and that a full evidentiary hearing—with an opportunity to cross-examine witnesses outside the hearing of the jury—should have been conducted by the Court before the determination was made. Respectfully, the Court disagreed, deploring the

on the matter. Pursuant to FED.R.EVID. 104(a), this Court was not bound by the rules of evidence in making its determination.[7] Accordingly, the Court considered all relevant portions of the trial record as well as the Sargent hearsay statements themselves. *See Bourjaily v. United States,* 483 U.S. 171, 178–80, 107 S.Ct. 2775, 2780, 97 L.Ed.2d 144 (1987). At the January 23rd hearing, the Court determined that substantially redacted portions of Sargent's statements to law enforcement authorities would be admissible at trial against Houlihan, Fitzgerald, and Nardone. On February 1, 1994, having reviewed the prosecutors' witness interview/trial preparation notes,[8] the Court revised its earlier order, further redacting the Sargent statements and declining to admit any of them against Fitzgerald. This memorandum now sets out the legal reasoning for these decisions and goes on to consider various related issues.

## II. DISCUSSION

### A. The Waiver Theory

#### 1. Sixth Amendment [9]

■ A waiver of a constitutional right is ordinarily valid only where there is "an in-

tentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The United States Supreme Court has long recognized, however, that the Sixth Amendment right of a criminal defendant to confront the witnesses against him can be waived not only by consent, but also by the defendant's misconduct. *See Snyder v. Massachusetts,* 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (constitutional rights may be waived by misconduct); *see also Illinois v. Allen,* 397 U.S. 337, 342–43, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970) (disruptive courtroom conduct waived confrontation right); *Reynolds v. United States,* 98 U.S. 145, 158, 25 L.Ed. 244 (1878) (defendant's refusal to reveal location of witness to U.S. Marshal waived confrontation right).

More recently, the Sixth, Eighth, and Tenth Circuits have held that when a defendant threatens or coerces a potential witness out of testifying at trial, the Confrontation Clause does not prohibit the admission of the witness' prior out-of-court declarations. *See Steele v. Taylor,* 684 F.2d 1193, 1198–99, 1204

---

burgeoning incidence of trials before trials and trials within trials. By holding off until almost the end of trial to rule on this issue, the defendants had the benefit of cross-examining the prosecution's witnesses in the trial proper. The actual trial proceeding combined with extensive oral argument on this issue was equally effective in safeguarding the defendants' rights as the voir dire proceeding requested by them, and was more than sufficient in the premises.

7. FED.R.EVID. 104(a) states:

Preliminary questions concerning ... the admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges.

8. It is necessary to explain here why the Court was looking at the government's notes. Apparently seeking to minimize material discoverable under the Jencks Act, 18 U.S.C.A. § 3500 (West 1985), the prosecutors alone made notes of the interviews with the key witnesses in this case. While law enforcement agents were present and have testified, they were apparently instructed not to make any written records as to these witnesses. The problems occasioned by this tactic will require a separate written opinion. It suffices here to say that this trial has involved a

great deal of skirmishing over what constitutes a "substantially verbatim statement," see *United States v. Neal,* 36 F.3d 1190, 1198 (1st Cir.1994), and impeachment evidence, see *United States v. Osorio,* 929 F.2d 753, 758 (1st Cir.1991). The Court initially relied upon the government to turn over redacted portions of its notes to comply with the legal mandate of the cases just cited. When the government proved itself unable or unwilling to comply to the Court's satisfaction, the Court took over the job, reviewing the notes in their entirety and disclosing such portions as were discoverable.

Thus, the government's notes were initially turned over to the Court *in camera* as a result of their failure to comply with this Court's earlier discovery instructions. *See* Trial Transcript, Vol. 41, at 162–76. In making its findings and rulings, the Court has not considered any portion of the prosecutors' notes not turned over to the defense and has not considered any of William "Bud" Sweeney's statements, as he had not yet testified at the time of decision.

9. The Sixth Amendment of the United States Constitution guarantees that: "In all criminal prosecutions the accused shall enjoy the right ... to be confronted with the witnesses against him ..." U.S. CONST. AMEND. VI.

(6th Cir.1982), *cert. denied sub nom. Kilbane v. Marshall,* 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983) (where defendant procured the silence of a witness by cohabitating with her, the admission of earlier out-of-court statements that the witness made to law enforcement officials did not violate the Confrontation Clause); [10] *United States v. Balano,* 618 F.2d 624, 626 (10th Cir.1979), *cert. denied,* 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980) (where defendant had coerced a witness into silence by threatening the witness' life, defendant waived his right of confrontation and his right to make hearsay objections); *United States v. Carlson,* 547 F.2d 1346, 1359-60 (8th Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977) (in drug prosecution, silencing of witness through threats of violence waived right to confront witness).

The Second and Fifth Circuits, as well as a district court in the District of Columbia, have adopted this analysis but taken it a step further. In addition to holding that a witness' prior statements may be admitted to prove the facts asserted, these courts have also concluded that such statements may be used as circumstantial evidence for the purpose of proving the additional charge of witness tampering or murder of the witness. *See United States v. Aguiar,* 975 F.2d 45, 47 (2d Cir.1992) (in drug prosecution, unsworn out-of-court statements by witness are admissible to prove charge of witness tampering where defendant through threats caused the witness not to testify at trial); [11] *United States v. Thevis,* 665 F.2d 616 (5th Cir.), *cert.*

*denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982) (where witness was murdered by the defendant for the purpose of procuring his silence, such statements could be admitted both to prove the facts asserted *as well as* the additional act of murdering the witness); *United States v. White,* 838 F.Supp. 618, 621, 625 (D.D.C.1993) (where defendant indicted for, *inter alia,* murder of an informant, informant's out-of-court statements to law enforcement authorities admissible at trial where the court finds defendant responsible for informant's death). Thus, these courts have adopted the proposition that a defendant indicted for, *inter alia,* threatening or murdering a potential witness, has—by virtue of the alleged threat or murder—waived his right to object to the admission of hearsay testimony.[12]

Following this line of reasoning, the government here argued that because Sargent was a potential trial witness who was made unavailable by the actions of Houlihan, Fitzgerald, and Nardone, these defendants waived their rights to object to the admission of out-of-court statements made by Sargent to the police. Although the First Circuit has never confronted this particular problem, the Fifth Circuit's decision in *Thevis* is similar in many respects to the instant case and therefore provided this Court with guidance.

In *Thevis,* the key witness in the prosecution's racketeering case against leaders of an illegal pornography operation was murdered about four months after the return of an indictment charging racketeering, and shortly before the witness was to enter the federal

---

**10.** The *Steele* court refused to frame its holding in terms of a "waiver" analysis, explaining that "[i]t is a legal fiction to say that a person who interferes with a witness thereby knowingly, intelligently and deliberately relinquishes his right to exclude hearsay." *Steele,* 684 F.2d at 1201 n. 8. Rather, the *Steele* court premised its holding on the notion that in order to protect the adversary process, courts should not allow "a person [to] profit from his own wrong." *Id.* at 1201–202.

**11.** *See also United States v. Thai,* 29 F.3d 785, 814 (2d Cir.), *cert. denied sub nom. Tran v. United States,* —— U.S. ——, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994).

**12.** At first blush, such an approach might seem circular—in order to determine whether a dead witness' statements are admissible at trial to

prove that the defendant killed the witness, the judge must first determine that the defendant *in fact* killed the witness. Nevertheless, there is ample precedent for such an approach. For example, the Rules of Evidence admit hearsay statements if made during and in furtherance of a conspiracy. Fed.R.Evid. 801(d)(2)(E). In cases in which one of the charged offenses is participation in a conspiracy, the judge must nevertheless make a determination that there was, in fact, a conspiracy before co-conspirator's statements may be considered by a jury. *See Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987); *United States v. Richardson,* 14 F.3d 666, 668–69 (1st Cir.1994); *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir.1977).

witness protection program. 665 F.2d at 621, 624. After the witness' death, a grand jury returned a superceding indictment which included charges of depriving a witness of his civil rights by murder in violation of 18 U.S.C.A. § 241.[13] *Thevis,* 665 F.2d at 621, 626. When the government sought to introduce the hearsay statement of the deceased witness to prove the civil rights violation, the district court admitted the statements in evidence and the Fifth Circuit affirmed. *See Id.* at 627.

This Court agrees with the Fifth Circuit that when confrontation of a witness is impossible because of actions of the persons asserting the right, "logic dictates that the right has been waived." *Id.* at 630. To allow a defendant to benefit from murdering a witness against him would "make a mockery of the system of justice that the [Sixth Amendment] was designed to protect." *Id.* This Court, therefore, held that the waiver analysis suggested by the government was grounded in both logic and precedent and was thus applicable to the case before it.

### 2. Federal Rules of Evidence

The Supreme Court has noted that, while the Confrontation Clause and Federal Rule of Evidence 802, barring the admission of hearsay, protect the same policy interests, *Ohio v. Roberts,* 448 U.S. 56, 63–64, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597 (1980), the rule and the constitutional right are not necessarily coterminous. *See California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970). Thus, despite the presence of a valid Sixth Amendment waiver, a minority of courts have held that, pursuant to the Federal Rules of Evidence, such hearsay is admissible *only* where the statements are also held to be sufficiently reliable. *See* FED.R.EVID. 804(b)(5); [14] *United States v. West,* 574 F.2d 1131, 1135 (4th Cir.1978) (grand jury testimony of murdered government witness sufficiently reliable that its admission did not violate the rule against hearsay); *Carlson,* 547 F.2d at 1353–55 (witness' grand jury testimony met the reliability standard of Rule 804[b][5] ).

However, in *Thevis,* the case closest to the one before the Court, the Fifth Circuit rejected such an approach, holding that Rule 804(b)(5) does not require a dual finding of waiver and reliability. 665 F.2d at 627–28, 633. Rather, the Fifth Circuit explained that where a defendant waives his right to confrontation under circumstances described above, that defendant also waives his right to object on the basis of hearsay. *Id.* at 628, 633.

Indeed, the majority of courts that have confronted the issue have held that when a defendant waives his Sixth Amendment rights by procuring the absence of a witness at trial, the accused also waives any hearsay objection to the admissibility of the witness' prior statements. *See United States v. Thai,* 29 F.3d 785, 814 (2d Cir.) *cert. denied sub nom. Tran v. United States,* —— U.S. ——, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994) (if defendant waives confrontation rights by procuring silence of trial witness, he has *a fortiori* waived his hearsay objection as well); *Aguiar,* 975 F.2d at 47 (same); *Thevis,* 665 F.2d at 630 (same); *Balano,* 618 F.2d at 626 (same); *cf. United States v. Innamorati,* 996 F.2d 456 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1073, 127 L.Ed.2d 391 (1994) (holding that where out-of-court statements fall within a firmly-rooted exception to the hearsay rule—such as declarations against interest under 804[b][3]—their admission

---

**13.** The statute made it a crime to "conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States ..." 18 U.S.C.A. § 241 (West 1969). The statute was amended in 1988 to cover "any inhabitant" of the United States or its territories. *See* 18 U.S.C.A. § 241 (West Supp.1993).

**14.** Rule 804(b)(5) lists as an exception to the rule against hearsay, when a declarant is unavailable:

A statement not specifically covered by any of the foregoing exceptions [to the hearsay rule] but having *equivalent circumstantial guarantees of trustworthiness,* if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. FED.R.EVID. 804(b)(5) (emphasis supplied).

does not violate the Confrontation Clause); *United States v. Rivera–Santiago,* 872 F.2d 1073, 1086 (1st Cir.), *cert. denied sub nom. Castro–Poupart v. United States,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989) (in determining whether out-of-court statements are admissible as statements in furtherance of a conspiracy, requirements of hearsay rule and Confrontation Clause are identical). This Court adheres to the majority view. Thus, a waiver of Sixth Amendment rights also constitutes a waiver of rights under the Federal Rules of Evidence.

### 3. Standard of Proof

■ Houlihan, Fitzgerald, and Nardone argued that in determining whether to admit Sargent's prior statements, the Court should analyze the government's proffer under the "clear and convincing" evidence standard. The government, on the other hand, urged the Court to adopt a "preponderance of the evidence" standard.

The government correctly noted that the majority of courts to address the waiver issue have adopted the preponderance standard. *See Aguiar,* 975 F.2d at 47; *Steele,* 684 F.2d at 1202; *Balano,* 618 F.2d at 629; *White,* 838 F.Supp. at 624. *But see Thevis,* 665 F.2d at 630–31 (adopting clear and convincing evidence standard).

Nevertheless, this Court thinks it significant that, where the accuracy of the evidence is important, the Supreme Court has conditioned admissibility on compliance with the clear and convincing standard. *See United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967) (prosecutor must demonstrate by clear and convincing evidence that in-court identification of

defendant was based on observations of the suspect at times other than during the police line-up identification).[15] Moreover, the Supreme Court has noted that the right to confront and cross-examine witnesses is a critical element of the truth-seeking process. *See Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). Indeed, cross-examination is "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Id.* (citation omitted). Although this right is not absolute, the denial or "significant diminution" of the right calls into question the integrity of the fact-finding process and "requires that the competing interest be closely examined." *Id.* Because here the right to confrontation is critically connected to the accuracy of the fact-finding process, the Court held that the "clear and convincing" standard is the appropriate standard for analyzing the waiver issue.[16]

### 4. Proof of Motive

Whenever a murderer kills a person who has knowledge of the murderer's other crimes, the murderer reaps the collateral benefit of preventing the victim from testifying at a later trial. Nevertheless, none of the cases that have permitted the use of the waiver doctrine to admit hearsay testimony have gone so far as to allow the admission of such testimony on this basis alone. Thus, the fact that a murder victim is not able to testify at trial is insufficient to invoke the waiver doctrine absent some showing that the victim was *in fact* cooperating with law enforcement authorities and was likely to have testified at trial *and* that these facts

---

**15.** In other contexts, however, the Supreme Court has held that determinations under Rule 104(a) may be governed by a preponderance of the evidence standard. *See United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974) (determination of whether defendant consented to search); *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972) (voluntariness of confession).

**16.** While this Court is confident that the higher "clear and convincing" evidence standard is appropriate here, it is less clear just what this means. The standard has been criticized as imprecise, *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 873, 330 N.E.2d 161 (1975)

(Quirico, J., concurring) and it is said that "proof by clear and convincing evidence is proof by a fair preponderance of the evidence—*but we mean it.*" William G. Young, *Judge Young on Evidence for the Trial Advocate,* 92–21.07 MCLE 26 (1992). Be that as it may, neither the Supreme Court nor the First Circuit has mandated a definition and this Court therefore has tried simply to give meaningful expression in its fact-finding to the plain import of the words "clear and convincing" themselves. *Cf. United States v. Olmstead,* 832 F.2d 642, 644–46 (1st Cir.1987) (phrase "beyond a reasonable doubt" need not be defined for jury as its plain import is sufficient).

provided a motive [17] for the murder. Indeed, the Fifth Circuit explained in a footnote in *Thevis* that in order to demonstrate waiver the government must prove by clear and convincing evidence *both* (1) that the defendant caused the witness' unavailability *and* (2) that this absence was procured for the purpose of preventing that witness from testifying at trial. 665 F.2d at 633 n. 17. Therefore, "even if the government proved by clear and convincing evidence that the defendant had caused the witness' absence, the hearsay evidence would still not be admissible until the government proved [by the same standard] the second part of the test." *Id.*

### B. *Application of the Waiver Theory to this Case*

Houlihan, Fitzgerald and Nardone argued to this Court that, even under the waiver theory proffered by the government, statements made to the police by George Sargent should not be admitted in evidence because (1) the murder of Sargent did not take place "on the eve of trial"; (2) the statements made by Sargent were insufficiently reliable; and (3) the government did not present sufficient evidence that Sargent was murdered *for the purpose of preventing him from testifying at trial.* These arguments will be addressed individually.

#### 1. "On the Eve of Trial"

■ First, the defendants argued that the waiver doctrine requires that an indictment or trial be pending at the time of the killing such that it takes place "on the eve of trial." The defendants argued that no court has ever gone so far as to admit the statements of a deceased or otherwise unavailable witness under the waiver theory where there was not a trial or even a charge pending at the time the witness became unavailable. *See Aguiar,* 975 F.2d at 47 (*one month prior to trial,* witness backed out of testifying due to threats); *United States v. Mastrangelo,* 693 F.2d 269, 271 (2d Cir.1982) (witness

killed while *on his way to the courthouse* to testify at the trial of the defendant); *Thevis,* 665 F.2d at 623–24 (witness killed after he testified before the grand jury but before he was scheduled to testify at trial); *Carlson,* 547 F.2d at 1352–53 (due to threats, witness backed out of testifying *the day before* the trial was to commence).

In this instance, Sargent's murder occurred in June of 1992, almost two and a half years before the trial commenced. Nevertheless, Sargent *in fact* had been cooperating with a police investigation of the Houlihan–Fitzgerald drug ring, in which law enforcement authorities were attempting to gather enough evidence to prosecute the defendants.

Additionally, although Houlihan, Fitzgerald, and Nardone may technically be correct that other courts to admit such testimony did so in cases where the murders occurred "on the eve of trial," none of the cases cited by the defendants attach any legal significance to this temporal fact. Certainly the cases cited above do not *preclude* the admission of statements taken by victims murdered earlier in the course of police investigation. Moreover, the position argued by the defendants is simply illogical. Indeed, the defendants' approach would require this Court to engage in a time-slicing exercise which would allow the admission of statements made by declarants killed "on the eve of trial" but not those made by declarants who had only recently agreed to cooperate with the government in a pending investigation and were murdered shortly thereafter. Such an approach would have the perverse effect of encouraging criminals to knock off suspected "rats" sooner rather than later to prevent the statements of the declarants from being used against them at a possible future trial. Therefore, the defendants' argument that there is no direct connection between the murder of Sargent and his unavailability at this trial fails as matter of fact, law, and logic.

---

**17.** It is important to note that it is not necessary that the desire to silence a potential witness be the *only* motivation a defendant had for murdering that victim. Indeed, many murders are committed for a variety of reasons. Therefore, this Court ruled that where there are mixed motives for a killing, the government may establish waiver by proving by clear and convincing evidence that the silencing of a potential witness was *one* of the motivations which led to the death of the victim.

### 2. Insufficient Reliability

■ Having failed to persuade the Court that the waiver theory may only be employed where the murder takes place "on the even of trial," Houlihan, Fitzgerald, and Nardone next argued that because the statements of Sargent were not made under oath, they are not reliable,[18] and therefore inadmissible. *See West,* 574 F.2d at 1136 (Confrontation Clause demands that out-of-court statements without "badges of reliability" be held inadmissible); *Carlson,* 547 F.2d at 1354 (statements admitted under Rule 804[b][5] must contain circumstantial guarantees of trustworthiness); *cf. Williamson v. United States,* — U.S. —, — – —, 114 S.Ct. 2431, 2435–36, 129 L.Ed.2d 476 (1994) (because non-inculpatory parts of statements made by an arrestee are *inherently* unreliable, they may not be admitted at trial under Rule 804[b][3] as statements against penal interest).

As a factual matter, the defendants were correct that most of the cases that have allowed such out of court declarations dealt either with cross-examined statements or with statements made under oath. Again, however, none of these courts have assigned any legal significance to such facts. Indeed, some courts have specifically held that once it has been determined that a defendant has waived his confrontation rights, even unsworn hearsay is admissible at trial. *See Thai,* 29 F.3d at 814 (statements to police admissible where defendant waived rights by procuring absence of witness); *Aguiar,* 975 F.2d at 47 (witness's unsworn and uncross-examined statements to police admissible where defendant procured witness' absence by threats); *White,* 838 F.Supp. at 625 (statements made by witness to patrolman and later memorialized in police reports admissible after finding of Sixth Amendment

waiver). The Court thus found that the question of reliability is legally immaterial. Reliability was left to the jury.

### 3. "For the Purpose of" Preventing Witness from Testifying at Trial

■ Third, and most significantly, Houlihan, Fitzgerald, and Nardone argued that the government failed to present sufficient evidence that Sargent was killed "for the purpose of" silencing him. More specifically, they argued that the government had not proved by clear and convincing evidence (a) that Houlihan, Fitzgerald, and Nardone *each* participated in the conspiracy to kill Sargent and (b) that *each* of these defendants had as at least one of his motives the desire to stop Sargent from "ratting" to the authorities.

(a) What evidence did the government proffer to indicate that George Sargent was, in fact, killed as a result of such a conspiracy by Houlihan, Fitzgerald, and Nardone? With respect to Nardone's participation in the murder, the government proffered the testimony of Michael Nelson.[19] At trial Nelson testified that Nardone recruited him to assist him in the murder of Sargent. *See* Trial Tr., Vol. 36, at 101–02. Nelson further testified in great detail about how he and Nardone actually carried out the murder. Nelson explained that he drove the "getaway car" while Nardone walked up to Sargent and shot him three or four times. *See* Trial Tr., Vol. 36, at 112–18.

Moreover, the government proffered the testimony of Cheryl Ann Dillon, the former girlfriend of Joseph Nardone. Ms. Dillon testified that Nardone confessed his involvement in the Sargent homicide to her. *See* Trial Tr., Vol. 32, at 98–105. Dillon said Nardone claimed that Nelson was the "trigger man" while Nardone only drove the geta-

---

**18.** Houlihan, Fitzgerald, and Nardone argued that because Sargent's statements were made after Sargent had been charged on two different occasions for drug offenses, he was obviously making the statements in order to curry favor with the police to gain leniency in his own case. *See* Trial Tr., Vol. 40, at 170.

**19.** Houlihan, Fitzgerald, and Nardone argued that Nelson's testimony is inherently unreliable and therefore insufficient to meet the clear and convincing standard. Although it may be true

that Michael Nelson appeared to be unreliable in some respects, his statements with respect to this incident were corroborated by a number of other witnesses. Thus, this Court found that in examining the totality of the circumstances, Michael Nelson's testimony—combined with the other evidence—was sufficiently reliable to constitute clear and convincing proof that Houlihan, Fitzgerald, and Nardone conspired to murder George Sargent.

way car, but Nelson contradicted this testimony.[20]

With respect to Houlihan and Fitzgerald's involvement in the Sargent homicide, the government proffered the following evidence: first, Michael Nelson testified that Houlihan and Fitzgerald wanted Sargent dead. *See* Trial Tr., Vol. 37, at 101; Vol. 36, at 101 (Nardone told Nelson that "John Houlihan and Fitzy ordered" Sargent's murder). Nelson also testified that Nardone recruited him to help him kill Sargent on behalf of "[t]he organization run by Michael Fitzgerald and John Houlihan about the cocaine business." *See* Trial Tr., Vol. 36, at 101. Moreover, Nelson testified that Nardone told him that Houlihan would pay them $5,000 if they shot Sargent. *See* Trial Tr., Vol. 36, at 111. Nelson further stated that he was, in fact, paid by John Houlihan via Nardone for his role in Sargent's death, at which point Nardone told Nelson that there would be more such jobs to come because "John and Fitzy [have] a list." *See* Trial Tr., Vol. 36, at 127. The government also offered Sargent's statements themselves to show that Sargent felt Houlihan might have been suspicious of him and might have been planning to kill him.[21]

In light of this evidence, the Court found by clear and convincing evidence that Mi-chael Fitzgerald, John Houlihan, and Joseph Nardone conspired to kill George Sargent.

(b) With respect to the evidence indicating that the defendants killed Sargent *for the purpose of preventing him from testifying against them,* the government marshalled the following evidence: first, the testimony of witnesses Pamela Flanagan,[22] Carol McCrary,[23] and Michael Nelson[24] demonstrated that Sargent was selling drugs for John Houlihan. *See* Trial Tr., Vol. 17, at 104; Trial Tr., Vol. 9, at 144; Trial Tr., Vol. 36, at 57–60. Second, Sargent's own statements to the police that he was a distributor for the Houlihan–Fitzgerald drug ring, *see supra,* likewise supported this finding. Third, there is ample evidence in the record that Sargent had been arrested and that upon his arrest he had in fact decided to cooperate with the police.[25] *See* Report of Trooper Mark Lemieux; Tape of Conversation between George Sargent and Boston Police Detectives. Fourth, Nelson testified that Houlihan and Fitzgerald wanted Sargent "taken care of" both because of Sargent's unpaid gambling debts and because they believed that he was cooperating with the police. *See* Trial Tr., Vol. 36, at 110; Vol. 37, at 6, 101.

In addition to the evidence in the official record, this Court considered the notes of the prosecuting attorneys taken at the time they

**20.** Indeed, the government advanced a theory as to why Nardone might have lied to Dillon about who actually pulled the trigger. On an earlier occasion, when Nardone confessed to Dillon that he had shot and killed James Boyden Sr., Dillon gave Nardone an ultimatum—one more killing and she would terminate the relationship. Given this threat, the government argued that Nardone lied about who was the actual trigger man in the Sargent shooting in order to preserve his relationship with Ms. Dillon.

**21.** According to the taped Sargent statements, upon hearing that two murders would be committed so that people "would get the message," Sargent became concerned with making sure Houlihan knew that he (Sargent) was loyal.

**22.** Ms. Flanagan testified that she bought cocaine from George Sargent on five or six occasions. On these occasions Ms. Flanagan would call Sargent's pager and would punch in a special code that he had previously given her. A few moments later, Sargent would arrive at her apartment with the cocaine. Trial Tr., Vol. 17, at 104, 109–11. Significantly, Ms. Flanagan also testified that on three or four additional occasions

when she "beeped" Sargent, John Houlihan delivered the drugs to her. Trial Tr., Vol. 17, at 112.

**23.** Ms. McCrary testified that on numerous occasions she purchased cocaine from Bud Sweeney and George Sargent. Trial Tr., Vol. 9, at 136–47.

**24.** Nelson testified that he purchased cocaine from Bud Sweeney and later from George Sargent, who replaced Sweeney as distributor. When Sargent showed up instead of Sweeney, Nelson was told that either Sargent or Joe Houlihan—John's brother—would be delivering from now on. Trial Tr., Vol. 36, at 57–60.

**25.** Though not part of the decision to admit Sargent's statements—because he had not then testified, *see supra* n. 8—the Court notes that there was evidence that Bud Sweeney, in the aftermath of the Sargent shooting, had a conversation with John Houlihan at the Alert Club in Charlestown in which Sweeney asked Houlihan what was going on. According to Sweeney, Houlihan replied that Sargent had to be killed because he was talking to the police.

interviewed key witnesses in this case. Thus, Special United States Attorney Robert Peabody's notation made during his interview with Michael Nelson that "JH thought Sarge would crack" confirms this Court's conclusion that one of Houlihan's motives for killing Sargent was to silence him.

Although the Court was unable to find by clear and convincing evidence that Sargent was killed because he was talking, the Court did find by clear and convincing evidence that Sargent was killed *either* because he was talking *or* because John Houlihan feared that eventually he would talk. As indicated by his statements to Nelson, Nardone knew that this was Houlihan's motive for wanting Sargent killed. Regardless of Nardone's own intentions as a member of the conspiracy, knowledge of Houlihan's motive and a willingness to act on it equals a tacit adoption by Nardone of Houlihan's motive as his own.

Thus, with respect to the defendants Houlihan and Nardone, the government met its burden on both prongs of the *Thevis* test. The government demonstrated by clear and convincing evidence *both* that Houlihan ordered the defendant Nardone and the witness Nelson to kill Sargent at least in part to stop him from cooperating with the police, *and* that Nardone was aware of Houlihan's motive for ordering the hit. Upon these findings by clear and convincing evidence, the statements made by George Sargent to the police prior to his murder were held to be admissible against Houlihan and Nardone at trial.

■ The government's offer of proof with respect to Fitzgerald, however, was somewhat more complicated. Although the government did prove by clear and convincing evidence that Fitzgerald was a part of the conspiracy to kill George Sargent, the Court was not satisfied that the government's evidence was sufficiently clear and convincing to support a finding that Fitzgerald acted with the *motive* of silencing Sargent at a later trial. Indeed, one comment in the prosecutors' file gave the Court pause for concern. Assistant United States Attorney ("AUSA") Paul Kelly's handwritten notes of prior discussions with Nelson indicate that Nelson originally told AUSA Kelly that Michael

Fitzgerald may have had a different motive for killing George Sargent than the one proffered by Nelson at trial. Indeed, Nelson appears to have told Kelly that George Sargent owed a large gambling debt to the "Murrays of Charlestown." At some point, according to Kelly's notes, Fitzgerald approached the Murrays and asked them to post bail for Bobby Levallee, another alleged foot-soldier in the Houlihan–Fitzgerald drug ring, who had recently been arrested. In consideration for posting bail, Fitzgerald offered to have Sargent killed. Kelly's notes state that, according to Nelson's original story, Fitzgerald wanted Sargent killed to "show respect for the Murrays."

Although it is not necessary that silencing of the declarant be the defendant's only motive for the killing, *see supra* n. 17, here the prosecutors' notes raise doubts as to whether the silencing of Sargent was one of Fitzgerald's motives at all. Kelly's notation that Fitzgerald wanted to kill Sargent "to show respect for the Murrays" casts doubt on Nelson's testimony that Fitzgerald wanted Sargent killed to silence him. No other evidence in the record indicates that procuring Sargent's silence was one of Fitzgerald's motives. Indeed, there is no evidence that Fitzgerald ever had knowledge of such a motive.

■ In *Mastrangelo*, the Second Circuit Court of Appeals stated that "[b]are knowledge of a plot to kill [a witness] and a failure to give warning to appropriate authorities is sufficient to constitute a waiver." 693 F.2d at 273–74. Without much elaboration, the Second Circuit seemed to indicate that even those members of a conspiracy who do not directly participate in the killing or who do not have direct knowledge of the purpose of the killing may nevertheless be held to have waived their constitutional and hearsay objections. Under this interpretation, a defendant such as Fitzgerald could be held to have waived his Sixth Amendment rights simply by being a part of a conspiracy to murder where one of the members of the conspiracy had the motive of silencing a witness. *But see White*, 838 F.Supp. at 618 ("[m]ere failure to prevent the murder, or mere participation in the alleged drug conspiracy at the heart of this case, must surely be insufficient to con-

stitute a waiver of a defendant's constitutional confrontation rights."). Because the waiver of a constitutional right is personal, this Court adopted the rule of *White* and rejected that of *Mastrangelo*, holding that a waiver cannot be accomplished through principles of agency. At a minimum, the prosecution must prove by clear and convincing evidence that each member of the conspiracy at least *knew* that one of the motives for the killing was the silencing of a potential witness. Others who join a conspiracy to kill for their own personal reasons, do not, because of their relationship with the other conspirators, waive their constitutional rights. Thus, the statements of George Sargent, while admitted against Houlihan and Nardone, were not admitted against Fitzgerald.

### C. What Portions of the Sargent Statements were Admitted?

Adoption and application of the waiver theory, however, did not end this Court's analysis. Indeed, only portions of Sargent's statements were ever disclosed to the jury. Two principles guided the Court's determinations as to redaction.

■■■ First, all of the courts that have adopted the waiver analysis have held that admissibility is limited to such out-of-court statements as would have been competent and admissible evidence had the declarant been able to testify in person. *See, e.g., White*, 838 F.Supp. at 625. This Court followed this same limitation and redacted all

portions of the Sargent statements which were not factual in nature *and* which were not grounded on Sargent's personal knowledge or did not constitute an admission or a statement of a co-conspirator. FED.R.EVID. 801(d)(2) & 801(d)(2)(E).

The Court then made a second pass through the Sargent statements to edit out all portions which either directly or through innuendo offended the teaching of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (admission of statements by codefendant that implicate other defendants at joint trial constitutes prejudicial error).[26]

In making this determination, the Court was guided by its discussions with the parties prior to trial. At that time, confronted by the government's motion to admit the Sargent statements, as well as the motions of certain defendants for severance, the Court and the parties thoroughly explored the implications of a broad reading of *Bruton* (a step that tends to maximize fairness for defendants) and a joint trial of as many counts as possible (a step that conserves scarce resources).[27] The result reached—a joint trial of six defendants coupled with a broad reading of *Bruton* principles—was one the government accepted prior to trial in order to avoid further severance rulings. Having agreed to structure the case in this manner, the government was thus unable later to convince the Court that Sargent's statements ought be admitted against Fitzgerald. The Court therefore struck portions of the Sar-

---

**26.** As the First Circuit has recently had occasion to note, given the dictates of *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), this Court may have accorded too broad a sweep to *Bruton* principles. *See United States v. Smith*, 46 F.3d 1223, 1228–29 (1st Cir. 1995). This Court respectfully acknowledges the point.

   The difference in approach is explained, at least in this case, not through any difference in the interpretation of the controlling legal framework, but rather in the difference in approach and function of trial and appellate courts. It is axiomatic that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *United States v. Barnett*, 989 F.2d 546, 560 (1st Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993). Thus *Bruton* and its progeny mark the "fairness floor." Fall below it, and

a retrial necessarily must ensue with all its attendant social and personal costs, as basic justice was not done. It is no disrespect to appellate courts to note that, in the great majority of cases, they must ask themselves, not what they would have done in the first instance, but rather whether the trial record is "good enough." The trial judge, of course, tries constantly to rise above the "fairness floor" and, weighing all the competing interests, reach for justice and accord the parties the fairest trial humanly possible. So here.

**27.** *See United States v. O'Bryant*, 998 F.2d 21, 25 (1st Cir.1993) (joint trials help both to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources); *United States v. Emberson*, 1994 WL 131729, at *1 (10th Cir.1994); *United States v. L'Allier*, 838 F.2d 234, 240–42 (7th Cir.1988).

gent statements which the government had steadfastly urged be admitted—a point to which it will be necessary to return.

### D. *The Defense Response*

Having exhausted their efforts to keep the Sargent statements from the jury, Houlihan and Nardone preserved their rights and, as was their prerogative, set sail on a strikingly different tack. They then claimed that the Court's editing unfairly bowdlerized the Sargent statements with the effect of making them *more* inculpatory of Houlihan than would otherwise be the case. Houlihan and Nardone thus sought to offer the Sargent tape recording in its entirety.

No doubt counsel for Fitzgerald and Herd held their breath at this point, ready to object had the government remained silent, since the full tape inculpates both Fitzgerald and Herd directly, by name, and in ways that offend the core values of *Bruton* even as explicated by *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The government, as expected,[28] leapt into the fray to raise a variety of hearsay and related objections. Because it would further prolong this already prolix opinion to work through each of these spats, it suffices here summarily to indicate the issues raised and resolved, leaving the rest to the trial record but expanding on the two points that occasioned the Court's greatest concern.

The government first argued that, as the Court had already ruled that Houlihan and Nardone waived their rights to confront Sargent or raise hearsay objections to his testimony, they likewise waived any right to introduce additional portions of the Sargent statements. The Court disagreed. It is one thing to rule that a defendant has waived his rights to object to the admission of certain evidence. But the objection here implicated an entirely different set of values—including

those undergirding the Compulsory Process Clause of the Constitution. Whatever Houlihan and Nardone may have done, they may not on that account be estopped from proffering competent, admissible evidence on their own behalf.

With that settled, Houlihan and Nardone resumed the offensive, arguing that, at least as to the portions of the Sargent tape originally proffered by the government but redacted by the Court, the government was itself now judicially estopped from objecting to their admissibility. Not so. The concept of judicial estoppel comes into play only where the government has obtained some advantage through its original position. *See Desjardins v. Van Buren Community Hosp.,* 37 F.3d 21, 23 (1st Cir.1994); *Patriot Cinemas v. General Cinema Corp.,* 834 F.2d 208, 212 (1st Cir.1987). Here it did not. The Court rejected the government's proffer of the disputed portions. Consequently, the government had the right now to interpose any appropriate objections when they were offered by the defense.

Houlihan and Nardone then offered the remainder of the Sargent tape under FED. R.EVID. 106.[29] The Court rejected the proffer because the disputed portions were sufficiently segregable that FED.R.EVID. 106 did not carry them into evidence.

Houlihan and Nardone next offered the remainder of the Sargent tape under the innominate exception to Rule 804. FED. R.EVID. 804(b)(5). "Unavailability" under Rule 804, however, is defined to exclude circumstances where "absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or certifying"—a matter pointed out to me by my students in evidence class at Boston University School of Law. By its express terms, therefore, FED.

---

28. The government, of course, feared a mistrial as to certain defendants should *Bruton* problems not be avoidable. Indeed, this Court later granted a partial mistrial upon motion of Fitzgerald as to certain counts after concluding that a certain conversation at Dapper Dan's bar was not in furtherance of one the conspiracies charged and thus could not be admitted against Fitzgerald. This mistrial, as the government rightly feared,

followed from a broad reading of *Bruton* principles.

29. That rule states: "When a ... recorded statement or part hereof is introduced by a party, an adverse party may require the introduction at that time of any other part ... which ought in fairness to be considered contemporaneously with it." FED.R.EVID. 106.

R.EVID. 804(b)(5) is inapposite. The relevant exception is FED.R.EVID. 803(24), where the availability *vel non* of the declarant is immaterial. As both exceptions have identical reliability limitations, however, it was necessary to consider the argument of Houlihan and Nardone under that exception.

■ Houlihan and Nardone argued that the Court's findings of "clear and convincing" evidence—which findings are based in part on the Sargent tape (indeed on certain portions of the tape that are here most hotly disputed, *see supra* )—necessarily resulted in a finding of "circumstantial guarantees of trustworthiness" which warranted admissibility under FED.R.EVID. 803(24). This logic is flawed. The Court found by clear and convincing evidence on the totality of the trial record before it at the moment of decision that Houlihan, Fitzgerald, and Nardone conspired together and carried out the murder of George Sargent. As the Court has been at pains to point out, *see supra*, it made no findings as to the reliability of Sargent. It was not required to. *See Thai*, 29 F.3d at 814; *Aguiar*, 975 F.2d at 47; *White*, 838 F.Supp. at 625. What is more, while certain discrete redacted portions of the Sargent tape may have been said to bear on material facts, FED.R.EVID. 803(24)(A), the tape was not "more probative on the point for which it [was] offered than any other evidence which the proponent[s] [could have] procure[d] through reasonable efforts," nor was it in "the interest of justice" to admit the remainder of the tape. FED.R.EVID. 803(24)(B). After all, had Houlihan and Nardone not orchestrated the murder of Sargent, he would have been available for cross-examination at trial.

During the taped interview, the following exchange occurred:

Det. Harris: After—shortly after the homicide, did you have a conversation with Houlihan again about Boyden, Sr. being killed?

Sargent: Yeah. I—I mentioned it, asked him about Billy Hurd (sic). I said, did you know him, you know, and he goes, yeah, I knew him. I says—I says, you know, I, you know, the papers are making it a drug war, I want to make sure

he knows I'm with you guys. He says, oh, yeah, he knows that you're with us so I took—took that to mean that he knew that he was going to kill these—Boyden.

Trial Exh. 250; Memorandum of Law in Support of the Government's Motion in Limine to Admit the Statements of George Sargent ("Government's Br."); Exh. B, at 9–10; *see also* Trial Exh. 250 (tapes); Trial Exhs. KZ, LA (transcripts marked for identification). Houlihan and Nardone argued that this statement is relevant and exculpatory as it tends to point to Herd as the murderer of Boyden Sr., a conclusion that may suggest a reasonable doubt as to the government's theory that it was Nardone who carried out that murder.

The government objected.

The Court sustained the objection because—while the statement may be both relevant and exculpatory—it is inadmissible hearsay, FED.R.EVID. 802, offered through an out-of-court declarant as to whom there is no showing of personal knowledge of the facts asserted. In short, the Court found that Sargent was not a competent witness as to these matters. FED.R.EVID. 601.

The tape also records:

Det. Harris: All right. Mr. Sargent, just before we started this taping, we were discussing several incidents that have happened, and being specific, I'm talking about homicides that have occurred in Charlestown and, being specific again, more recently in the last couple of months.

I would like for you, in your own words, please, if you would, tell us of the first homicide that you recall that we spoke about earlier and, if you would, in your own words, would you tell us what happened?

Sargent: Just—Jimmy—I was going to say Muffin, you know. James Boyden comes (Unintelligible) He was down on—around Monument Street trying to—taking over a territory that was Mikey Fitz's girlfriend's territory so Fitzy went and gave him a warning to get out

of there and not to do—sell drugs there or—but he didn't heed the warning.

So he went down the—the flower shop where Fitzy was working, called Fitzy a piece of shit. Fitzy gave him a beating, and I talked to Fitzy the day after, and he said, I'll just have to kill him and a couple weeks later, he was dead.

Government's Br., Exh. B, at 3–4.

Houlihan and Nardone argued that this is a statement against Fitzgerald's penal interest, Fed.R.Evid. 804(b)(3).[30] Here, at least as to the communication from Fitzgerald to Sargent, Houlihan and Nardone were correct. Fitzgerald was "unavailable" due to his Fifth Amendment privilege to remain silent at trial. Fed.R.Evid. 804(a)(1). What is more, this statement has particularized guarantees of trustworthiness as to the identity of the person who ordered Boyden Jr.'s death in view of the extensive trial record on this point.

Houlihan and Nardone, however, were not charged with killing Boyden Jr. Nevertheless, they argued that the statement was a crucial part of their defense to the charge that they had a hand in killing Sargent. For, they argued, once Fitzgerald had confessed to the murder of Boyden Jr. to Sargent, who but Fitzgerald would have had a greater motive for killing him once it became suspected that he was talking to the police? There is force to this argument, and the Court agreed that the statement was relevant.

Once again, the government objected.

The Court sustained the objection because, while "totem pole" hearsay is admissible if each "totem" on the "pole" qualifies as a hearsay exception, Fed.R.Evid. 805, the communication from Sargent to the police which is the subject of the tape is an out-of-court declaration offered for the truth of the matter asserted, i.e., that Sargent was accurately and truthfully recounting what Fitzgerald had said. It is, therefore, inadmissible hearsay. Fed.R.Evid. 802.

This is the statement that arguably came closest to admissibility under 803(24) and the Court carefully considered that issue. The Court rejected the proffer under that exception for the reasons already stated and notes that the circumstantial guarantees of trustworthiness here run to the reliability of Fitzgerald's confession, *not* to the reliability of Sargent—caught with a large quantity of cocaine, flipped by the police, and seeking to curry favor as an informant—accurately perceiving and reliably reporting whatever it was that Fitzgerald said to him, if anything.

Failing in their multifaceted attempt to have the redacted portions of the tape admitted substantively, Houlihan and Nardone, noting that admission of the edited Sargent statements opens him up to impeachment in the manner of any live witness, Fed.R.Evid. 806, argued that redacted portions of the tape ought to be admitted, not for the truth of the matters asserted, but as prior inconsistent statements. The Court rejected these proffers on the grounds that they were too convoluted, collateral, or cumulative to be admitted and because the Court had afforded adequate leeway to counsel to "cross-examine" Sargent's reliability through their cross-examination of the police witnesses attesting to the statements. *Cf. United States v. Ovalle-Marquez,* 36 F.3d 212, 217 (1st Cir. 1994) (trial judge has discretion to control the scope of cross-examination), *cert. denied,* — U.S. —, 115 S.Ct. 947, 130 L.Ed.2d 891 (1995); *United States v. Akitoye,* 923 F.2d 221, 225 (1st Cir.1991) (same).

## III. CONCLUSION

It is for these reasons that the Court handled the Sargent statements as it did.

---

**30.** The phrases "admission" and "co-conspirator statement" were also bandied about. Neither of these hearsay exceptions helped the defendants, however, since both depend on the declarant's being the party opponent. Here, Fitzgerald was a co-defendant.