Filed 2/25/25  P. v. Reed CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BYRON REED,<br><br>    Defendant and Appellant. | A168502<br><br>(San Francisco County Super. Ct. Nos. SCN234754, CT21009063) |

Paul Ortega was beaten to death after he interrupted an early morning drug deal in the Hunters Point neighborhood of San Francisco.  Surveillance cameras recorded the murder.  The footage shows a scuffle between defendant Bryon Reed and Ortega during which Ortega is knocked to the ground.  Reed can be seen repeatedly kicking Ortega and stomping on his head as he is lying on the ground.  Nearly a year later, police arrested Reed after he led them on a high-speed chase through the streets of San Francisco and across the Bay Bridge.  Following a multi-day trial and eight days of deliberation, a jury convicted Reed of murder and evading police.

On appeal, Reed contends his convictions should be reversed because the trial court erred by:  (1) excluding statements of an unavailable eyewitness; (2) excluding Reed's proffered testimony relating to his state of mind at the time of the murder; and (3) giving a flight instruction.  We affirm.

# BACKGROUND

## A. *The Prosecution's Case*

### 1. *The Murder*

In the early morning hours of July 23, 2020, the San Francisco Police Department (SFPD) responded to a call about a body lying on the ground at 2111 Jennings Street. Upon arrival, police discovered the victim, later identified as Ortega, lying face down and motionless. He was not breathing and had no pulse. Ortega was pronounced dead at the scene.

Police canvassed the area for all available video surveillance footage. The surveillance footage, which was shown to the jury, showed Reed in the early morning in a parked car on Jennings Street. When another car pulled up, Reed got out of his car and stood between the two cars. Ortega, who was walking on the sidewalk, stopped and stood by Reed's car. Ortega walked up to Reed and stood close to him. Reed pushed Ortega away. Ortega walked back toward Reed, at one point grabbing something off the ground; Reed pushed Ortega away again. Ortega stood in a fighting stance with his fists up, and Reed pushed his chest out at Ortega. Eventually, Ortega walked away from Reed, crossed the street, and sat down. Reed returned to his previous location, standing between the cars. Seconds later, Reed crossed the street towards Ortega. Ortega appeared to grab at his side. Ortega stood up and resumed his fighting stance. Ortega lunged forward towards Reed. After wiping his face, Reed jumped toward Ortega and punched him in the face. Reed and Ortega punched each other multiple times, but the entire fight was not recorded as a van partially blocked the camera's view.

The next clear view is of Ortega lying on the ground and Reed standing over him. Reed then repeatedly stomped on Ortega's face and head. Reed momentarily stopped the attack and bent over Ortega as he checked Ortega's

pockets. Reed stood up and kicked Ortega again, picked Ortega up, and slammed him to the ground. Reed bent down and looked through Ortega's pockets again. Reed turned Ortega over on his stomach and checked his back pockets. As Ortega lay face down and motionless, Reed kicked him in the head one more time before he got in the passenger side of a waiting car.

An autopsy revealed that Ortega died from multiple traumatic injuries, with the most significant injuries being to his head. The medical examiner testified that Ortega "had a lot of pattern contusions or pattern bruises to his face, some of which looked like a shoe print." The parties stipulated that Reed's DNA was found on Ortega's clothing.

### 2. *Reed's Arrest*

On September 10, 2021, SFPD Officer Bret Grennell saw Reed in a parked car at 23rd Street and Dakota Street. Officer Grennell knew there was a warrant out for Reed's arrest, so he approached Reed and said, "Hey, man, what's up?" Reed immediately started the engine of his vehicle and drove on the sidewalk to get around the police car. Officer Grennell pursued Reed with his lights on and siren activated. Reed ran multiple stop signs and streetlights and quickly and erratically changed lanes. Reed eventually got on Highway 80 at the Bay Bridge onramp. From there, a highway patrol unit took over the pursuit across the Bay Bridge but terminated it without arresting Reed.

Later that same day, SFPD Officer Dominic Coyne saw Reed in the same car at the intersection of 25th Street and Dakota Street and arrested him without incident.

## B. *Defense Case*

Reed testified that, around 2:30 in the morning of July 23, 2020, he had been out driving with a female acquaintance when the two stopped at Mother

3

Brown's Kitchen to smoke crystal meth and have a couple of drinks. While they were outside, a car pulled up with three women inside who asked Reed if he had any drugs for sale. Reed said yes and sold two of them drugs.

During the drug sale, one of the women told Reed there was a man, Ortega, who was standing close to his back. When Reed turned around, Ortega was a couple inches from his face. Reed backed up, pushed Ortega's face, and said something along the lines of "[w]hat are you doing? Back up. Why are you on me like that?" Ortega took a few steps back, picked up a cigarette from off the ground, and flicked it towards Reed's face. Reed approached Ortega "like, Why would you do something like that; what's your problem?" Ortega "took a fighting stance . . . balled up his fists and was like 'come on, come on,' and took a swing and was 'come on, come on,' took another swing."

Reed testified, "I just didn't take it serious," and, "I just took it like he's a clown—like what is he trying to do?" Reed said Ortega was "not very threatening."

Reed walked back to the three women, and Ortega crossed the street and sat down. Ortega was "popping off at the mouth" and "talking mess."

Reed walked across the street "to defuse the situation from the encounter we had the first time—just to like, you know, ask him what's going on? What are you doing? Why are you trying to fight and do all the negative stuff, so." Reed agreed that at that point, he could have returned to his car and avoided any fight because Ortega was not a threat to him. Instead, Reed confronted Ortega because he felt comfortable in the neighborhood and did not want to leave.

Ortega got up as if he wanted to fight again and grabbed his side as if he were holding a weapon. Ortega lunged forward and spit in Reed's face.

4

Reed did not remember initially feeling threatened by the spit. Rather, "[g]etting spit on" made Reed "angry." He said that "the only thing more disgusting" than getting spit on would be having "shit thrown on you."

Reed felt he had to defend himself immediately because he thought Ortega was going to pull out a weapon, and the spit was a distraction. Reed rushed toward Ortega and "believe[d]" he hit him. Ortega also hit Reed, causing Reed to fall to one knee; Reed fought his way back up.

Reed did not remember any of the fighting behind the van, throwing Ortega to the ground, or repeatedly kicking Ortega. He did, however, recall searching Ortega's pockets for a weapon. Reed got in his friend's car and left the scene. Reed did not call the police because he thought it was "just a fight" and that it was over.

Reed testified that he grew up in Hunters Point, which was a "pretty rough neighborhood" where he witnessed violence as a child. He also testified about three instances in which he personally was a victim of violence (one shooting and two stabbings). Reed never called the police or otherwise reported the incidents. He explained that in his neighborhood "if you report anything to the police, you're labeled a snitch."

Reed testified that he fled from police on September 21, 2021, because he had drugs on him and he "didn't want to get caught with them." After driving away, Reed pulled into a gas station and discarded the drugs and drove back to 25th and Dakota. Reed was unaware that there was a warrant for his arrest and first learned of Ortega's death at the time of his arrest.

## C. *Verdict and Sentencing*

The jury convicted Reed of second degree murder (Pen. Code,[1] § 187, subd. (a)) and evading a police officer (Veh. Code, § 2800.2, subd. (a).) The

---

[1] Further undesignated statutory references are to the Penal Code.

trial court sentenced Reed to an indeterminate term of 15 years to life in state prison.

## DISCUSSION

Reed argues he was denied his right to fully present a defense because the court prevented him from introducing evidence of the only eyewitness who would have corroborated his testimony and supported his claims of self-defense, imperfect self-defense, and voluntary manslaughter based on heat of passion. He further asserts he was denied the opportunity to present exculpatory evidence regarding his state of mind at the time of the murder. Finally, Reed contends the trial court prejudicially erred by providing a flight instruction to the jury.

We begin with an overview of the law of self-defense and applicable standards of review before addressing the evidentiary issues and the claim of instructional error.

### I. Applicable Law

" ' "Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)" [Citation.] Generally, the intent to unlawfully kill constitutes malice. (§ 188; [citations].) "But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable [or imperfect] self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that

6

otherwise inheres in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation].' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549, italics omitted.) "If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case [citation], the People must prove beyond reasonable doubt that these circumstances were lacking in order to establish the murder element of malice." (*People v. Rios* (2000) 23 Cal.4th 450, 462, italics omitted.)

A homicide is considered justified as self-defense where the defendant actually and reasonably believed the use of deadly force was necessary to defend against imminent danger and the defendant's belief was both objectively and subjectively reasonable. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) "If the belief subjectively exists but is objectively *unreasonable*," it is imperfect self-defense and the defendant may be convicted of manslaughter, but not murder. (*Id.* at p. 1082, italics added.) In such cases, the primary issue for the jury is the reasonableness of the defendant's subjective beliefs. (*Id.* at pp. 1082–1083.)

On appeal, Reed claims the court's evidentiary rulings hindered his ability to establish that he was acting in self-defense or in a heat of passion. We review a trial court's ruling on the admissibility of evidence, including a decision that turns on the hearsay nature of evidence, for an abuse of discretion. (*People v. Sanchez* (2019) 7 Cal.5th 14, 39; *People v. Waidla* (2000) 22 Cal.4th 690, 725.) Under this standard, the trial court's decision may only be reversed if it was "so erroneous that it 'falls outside the bounds of reason.' A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or

patently absurd manner that resulted in a manifest miscarriage of justice." ' "
(*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

"As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836, and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman v. California* (1967) 386 U.S. 18, 24)." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.)

## II.  Evidentiary Issues

Reed claims the court committed evidentiary error by excluding the statements of an unavailable eyewitness, U.B.,[2] and by limiting his ability to testify about his state of mind at the time of the murder. He further claims these errors deprived him of a fair trial.

### A. *The Trial Court Did Not Err in Excluding Statements of an Unavailable Eyewitness*

Reed mounts the following two-front challenge to the court's evidentiary ruling: (1) the police wrongfully caused U.B. not to testify; and

---

[2] The record reflects that the witness is sometimes referred to as V.B. On appeal, both parties refer to the witness as U.B.; consistent with the appellate briefs, we refer to the witness as U.B.

(2) he was denied a fair trial because U.B.'s excluded statements were reliable and exculpatory. As we explain, these contentions are without merit.

     1. *Additional Background*

     On the day of the murder, Sergeant Domenico Discenza interviewed U.B. at the Bayview Police Station. At the start of the interview, U.B. said she did not want her name written down. U.B. told Sergeant Discenza she had been in the process of buying drugs from Reed, when Ortega came up from behind Reed and stood very close to him. Reed turned around and shoved Ortega. Reed said, "[D]on't put your fuckin' hands on me," and, "[G]et off my neck. I don't know you like that." When Ortega got near Reed again, Reed slapped Ortega in the face, which caused Ortega's cigarette to fall out of his mouth. Ortega looked for his cigarette on the ground, picked it up, and flicked it into Reed's face. Ortega also spat on Reed. Ortega then walked across the street.

     Upon finishing the drug sale with U.B., Reed said, "[F]uck that," and, "I'm not letting you get away with that." Reed approached Ortega in a "threatening" way. As Reed approached, a woman in Reed's vehicle said, "come on. Don't do that. Let's go. Come on. Just let it go." Reed "was like, hell no. He spit on me." Meanwhile, Ortega said, "Come on. Bring it. What's up?"

     At some point while Reed was approaching, Ortega reached behind his back. Reed said, "What you pullin'? What you gettin'? And then he just start[ed] swinging. They started fighting." U.B. watched from the other side of the sidewalk as the two men fought. At first, Reed fell to the ground, and Ortega was subsequently "tryin' to get away." However, Reed got back up and rushed Ortega. Reed punched Ortega, which caused him to lose consciousness and fall to the ground. While Ortega was "knocked out

9

already," Reed was "kicking him. And stomping his face." U.B. thought, "[W]hy are you still doing that?" Reed was stomping on Ortega's head and kicking him continuously "real hard." Reed also went through Ortega's pockets. Eventually, Reed went back in the vehicle and left the scene. At the end of the interview, U.B. said that Sergeant Coleman knew how to contact her.

A little over a year later, another SFPD officer, Sergeant Mark Hutchings, conducted a second interview of U.B. As in the first interview, U.B. expressed her desire to remain anonymous. Sergeant Hutchings let U.B. know that he had been trying to locate her. U.B. explained that her address frequently changed and that she was not living at the same address as when the incident transpired. Sergeant Hutchings told U.B. not to state where she was living because the interview was being recorded. Sergeant Hutchings told U.B. that he would ask for her mother's address once the recording was turned off because her mother was someone "stable in [her] life that [she went] to all the time." He also encouraged U.B. to stay in touch with Sergeant Coleman so she could receive help for her sobriety.

U.B. told Sergeant Hutchings that another woman also witnessed the incident. Sergeant Hutchings assured U.B. that he would not pressure her for the woman's name, but "[t]here are gonna be other people that may pressure you. And you don't have to tell anybody who she is. You can if you want." Sergeant Hutchings elaborated, "If she doesn't want to come forward—now, I need to make it clear. There's gonna be other people that are gonna want to talk to you . . . . [¶] You don't have to talk to anybody you don't want to." Sergeant Hutchings said the police would protect her as much as they could. Given that the murder was video recorded, Sergeant

10

Hutchings believed it was unlikely that the prosecution would call U.B. as a witness.

U.B.'s retelling of the incident during her second interview with police was largely consistent with her first. Given both Reed and Ortega had been in prison, U.B. emphasized that it was particularly unacceptable in prison culture to spit in someone's face. Reed "was basically defending himself because the guy spit in his face." However, she said Reed's response was "way too much." U.B. said Reed "was defending his honor but you can overdo that too, like. He was on the ground. You made your point. Like, come on."

2. *Trial Court's Ruling*

Prior to trial, defense counsel filed a motion to admit U.B.'s out-of-court statements in lieu of her testimony. Defense counsel first argued that U.B.'s statements were admissible under the forfeiture by wrongdoing doctrine because the police wrongfully caused U.B. not to testify. (Evid. Code, § 1390.) He next argued that exclusion of U.B.'s statements would violate Reed's constitutional rights to due process, a fair trial, and to present a defense under the state and federal Constitutions. The People countered that neither the police nor the prosecution engaged in conduct amounting to forfeiture by wrongdoing under Evidence Code section 1390 and that due process did not require the admission of U.B.'s statements.

Finding no intentional wrongdoing on part of the police or prosecution, the court denied Reed's motion. The court rejected Reed's claim that his due process right to present evidence in his own defense as outlined by *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) was violated. The court noted that the ability to test U.B.'s reliability was limited, and it distinguished *Chambers* by noting the exclusion of evidence in that case was based on a

11

"hyper technical rule"[3] unlike the hearsay rule at issue here. Additionally, since U.B. was purchasing drugs at the time of the incident, the court had "no idea what state she's actually in as she's watching" the fight between Reed and Ortega.

3. *The Forfeiture by Wrongdoing Hearsay Exception Does Not Apply*

Evidence Code section 1390 "codifies the forfeiture by wrongdoing exception to the hearsay rule. It 'outlines an exception to the hearsay rule for statements that are offered against a party involved in causing the unavailability of the [hearsay] declarant as [a] witness.' " (*People v. Hall* (2024) 107 Cal.App.5th 222, 239.)

Specifically, Evidence Code section 1390 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." (*Id.*, at subd. (a).) "The party seeking to introduce a hearsay statement under section 1390 bears the burden of proving its applicability by a preponderance of the evidence, and this proof may not be solely based on the statement of the unavailable declarant, but must instead also be supported by independent corroborative evidence. (*Id.*, subd. (b)(1) & (b)(2).) When deciding whether or not to admit the statement, the court 'may take into account whether it is trustworthy and reliable.' (*Id.*, subd. (b)(4).)" (*People v. Hall*, *supra*, 107 Cal.App.5th at p. 240.)

The underlying factual issues to be resolved by the trial court in applying the forfeiture by wrongdoing doctrine include: (1) whether by the

---

[3] *Chambers* involved Mississippi's common law " 'voucher' rule" which prohibited a party from impeaching his own witness. (*Chambers*, *supra*, 410 U.S. at pp. 295–296.)

party's wrongful conduct the party caused a witness to be unavailable to testify; and (2) whether the party intended to cause the witness to be unavailable. (*People v. Reneaux* (2020) 50 Cal.App.5th 852, 865.)

In reviewing the trial court's decision to admit evidence under the doctrine of forfeiture by wrongdoing, we "evaluate whether there is sufficient evidence from which the trial court could make its finding[s] on a preponderance [of the evidence] standard." (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1186.) "Although we apply a substantial evidence standard of review to the trial court's factual finding[s], '[w]e review for abuse of discretion the ultimate decision whether to admit the evidence.' " (*People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1050.)

On the record before us, we find there is substantial evidence to support the court's ruling that neither the police nor the prosecution caused or intended to cause U.B. to be unavailable as a witness. Preliminarily, it is reasonable to infer that Sergeant Hutchings told U.B. not to give her address as a means to honor her request for anonymity. (See *People v. Oliver* (2023) 90 Cal.App.5th 466, 482 [under substantial evidence standard of review, reviewing court accepts all reasonable inferences from evidence].) Importantly, Sergeant Hutchings never told U.B. she should not testify at trial. Rather, he indicated that, in light of the video showing Reed beating the victim to death, he thought it was unlikely that the prosecution would call her as a witness. Although Sergeant Hutchings told U.B. that she did not "have to talk" to anyone if she did not want to, he did not tell her she should disregard a subpoena from the defense. (Cf. *People v. Valdez* (2012) 55 Cal.4th 82, 118–119 [while "a criminal defendant may ask witnesses to give interviews, witnesses have no legal obligation to grant that request; they may decline to speak with a defendant"].) Contrary to Reed's contention, that

U.B. "was extremely frustrated and angry" when she was served with the defense subpoena does not suggest the police did anything to dissuade her from testifying at trial. Accordingly, the trial court's decision to preclude U.B.'s statements for lack of wrongdoing by the police is supported by substantial evidence.

The cases cited by Reed are inapposite and do not compel a contrary conclusion. In each case, the prosecution was able to introduce the proffered evidence due to clear misconduct by the defendant. For example, in *Reynolds v. United States* (1878) 98 U.S. 145, 160, the United States Supreme Court held the forfeiture by wrongdoing doctrine applied where the defendant had told an officer looking for a witness that the witness would " ' "not appear in this case" ' " and was not home, when the facts suggested that she was. Similarly, in *People v. Reneaux*, *supra*, 50 Cal.App.5th 852, the defendant in a domestic violence case told his girlfriend to recant her statements to law enforcement so he could get out of jail and marry her to take advantage of the marital privilege. (*Id.* at pp. 865–867.) In *Steele v. Taylor* (6th Cir. 1982) 684 F.2d 1193, 1203, the defendant procured the silence of a witness in a murder for hire case by cohabitating with her. And in *Carlson v. Attorney General of California* (9th Cir. 2015) 791 F.3d 1003, 1005, the court upheld the application of the forfeiture by wrongdoing doctrine finding the trial court reasonably inferred the defendant had sequestered his wife so that she could not be compelled or otherwise persuaded to testify. (*Id.* at pp. 1012–1013.)

Here, by contrast, there is no evidence of any intentional deception or direct conduct on the part of the SFPD or the prosecution to purposely render U.B. unavailable or otherwise dissuade her from testifying.

14

4. *Any Possible Error Would be Harmless*

Turning to Reed's alternative argument, the trial court did not err in excluding U.B.'s statements at trial, and, on this record, any related error is harmless. Preliminarily, U.B.'s statements were largely duplicative of the security footage depicting the incident and Reed's own description of the sequence of events. For example, while U.B.'s statements that Ortega disrespected Reed first by spitting on him were arguably exculpatory in that they corroborated Reed's similar testimony, any exculpatory value was minimal as the same conduct was generally visible—once explained—on the surveillance video.

More importantly, U.B.'s statements to police supported the jury's verdict rather than Reed's defense theories. U.B. described in detail how Reed brutally beat Ortega to death after he was already unconscious. U.B.'s explanation that Reed's response was consistent with defending one's honor in "prison culture" was at odds with Reed's testimony that the spit was a distraction and that he acted in self-defense because he was afraid Ortega had a weapon. U.B. opined that Reed's response was "way too much." Although Reed was "defending his honor," U.B. said, "you can overdo that too, like. He was on the ground. You made your point. Like, come on." To the extent Reed claimed he was acting under heat of passion, the applicable legal standard is how a reasonable person would have reacted to being spit on. (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.) Reed's desire for revenge did not constitute actionable heat of passion. (*People v. Lujan* (2001) 92 Cal.App.4th 1389, 1411 [passion aroused need not be anger or rage, but can be any " ' " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " ' " [citations] other than revenge"].)

15

Finally, evidence that Reed acted in self-defense or in the heat of passion was practically non-existent while the evidence of his guilt was overwhelming. By his own testimony, Reed said Ortega initially was "not very threatening." It was only after Reed re-started the confrontation with Ortega that Reed said he became afraid Ortega had a weapon. But, even after subduing Ortega and purportedly checking his pockets for a non-existent weapon, Reed continued to kick Ortega and slam his lifeless body onto the ground. In this context demonstrated through surveillance video, U.B.'s statements would not have bolstered Reed's claims of self-defense and heat of passion. Thus, we conclude there is no reasonable likelihood the admission of U.B.'s statements would have led to a more favorable result. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## B. *The Trial Court Did Not Err in Excluding Evidence Regarding Reed's State of Mind at the Time of the Murder*

Reed claims the court erred in excluding evidence of his earlier experiences of violence that impacted his state of mind. As we explain, we find no error, and, on this record any possible error was harmless.

### 1. *Additional Background*

At trial, Reed wanted to testify about his history with violence to show his state of mind at the time of the murder. Specifically, Reed wanted to tell the jury that "as a child, he regularly witnessed violence in the neighborhood, including an incident when, at the age of 8 or 9 he witnessed a man beat another man over the head with a hammer; [¶] That he has personally been the victim of violent attacks, including two stabbings and a shooting; [¶] That he has known friends and family members who have been victims of violence, including two in particular: [¶] . . . [A] close friend, who was shot in the back and killed roughly ten years ago; and [¶] . . . [A] cousin, who was shot in the back and killed in February 2020 just down the street from Mother Brown's

16

Kitchen, where the incident took place; [¶] That as a result of these experiences, he has a heightened sensitivity to violence and the threat of violence, and he is acutely aware of when he is in situations in which violence is about to occur; [¶] That as a result of these experiences, he actually believed he was in imminent danger of being killed by . . . Ortega on July 23, 2020; [¶] And that as a result of these experiences, he believed that had he attempted to retreat, Ortega could have shot him in the back."  Relying on *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732 (*Sotelo-Urena*), defense counsel argued admission of Reed's experience with violence was relevant to show his "ability to predict accurately when violence is about to take place" and whether it was "reasonable to use that amount of force."

2. *Trial Court's Ruling*

In denying Reed's motion, the court found *Sotelo-Urena* was distinguishable because it involved expert testimony linking the defendant's history with violence to the ability to perceive violence among chronically unhoused people.  The court noted that while some testimony of Reed's experience was relevant and helpful to the jury in analyzing Reed's theory of imperfect self-defense, a narration of the specific traumatic events Reed had experienced were not relevant to the reasonableness of his belief in protecting himself from Ortega.

Specifically, the court explained that events with which Reed was not directly involved were not relevant to his personal belief in the need to defend himself.  Further, these prior events suffered from infirmities like hearsay and lack of personal knowledge and were subject to exclusion under Evidence Code section 352.  Nevertheless, the court ruled Reed could testify about certain more recent events that happened to him personally, as this was

17

relevant to Reed's belief that "violence can escalate very quickly."[4]  Reed was also permitted to testify about his experiences witnessing violence and whether he had known people who were killed by violence.

   3. *The Trial Court Did Not Abuse its Discretion*

Trial courts also have discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352; *People v. Crew* (2003) 31 Cal.4th 822, 840.)  A trial court's exercise of discretion in admitting or excluding evidence "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10; *People v. Giminez* (1975) 14 Cal.3d 68, 72.)

It was well within the court's discretion to conclude that evidence about violence Reed witnessed as a child, particularly a single incident that occurred when he was 8 or 9 years old (or 37 years before he beat Ortega to death), was not probative of his state of mind when he killed Ortega.  A heat of passion defense requires the provocation inciting the homicide to have been caused by the victim; it cannot be caused by something Reed allegedly witnessed as a child.  (*People v. Moye*, *supra*, 47 Cal.4th at pp. 549–550.)  Reed's awareness that two people he knew had been shot in the back and killed in the same general area was similarly lacking in probative value.  Reed did not witness or have direct knowledge of these shootings or the

---

[4] The court excluded the violent event Reed witnessed as a child as too remote.

18

causal circumstances, and there was no suggestion that Ortega was involved in the murders.

Thus, without an evidentiary foundation such as in *Sotelo-Urena* (*Sotelo-Urena, supra,* 4 Cal.App.5th at p. 750), any connection between Reed's state of mind when he killed Ortega and what Reed witnessed as a child or had more recently heard about people being shot was speculative and irrelevant. (*People v. Morrison* (2004) 34 Cal.4th 698, 711 ["Evidence is irrelevant, however, if it leads only to speculative inferences"]; *People v. Stitely* (2005) 35 Cal.4th 514, 548–550.)

Similarly misplaced is Reed's reliance on *People v. Humphrey, supra,* 13 Cal.4th 1073, where our Supreme Court held that expert testimony regarding battered women's syndrome was admissible to show the reasonableness of the defendant's belief in defending herself. (*Id.* at p. 1076.) But both *Sotelo-Urena* and *Humphrey* involved prior incidents of violence perpetrated by the *victim* against the defendant, not a defendant's knowledge of violence he previously witnessed or heard about. (*Sotelo-Urena*, at p. 745 [defendant believed victim had stabbed him a few weeks prior]; *Humphrey*, at pp. 1079–1080 [defendant shot abusive husband who had been battering her].)

Because the trial court reasonably concluded that the excluded evidence offered no additional probative value of Reed's state of mind when he killed Ortega, or alternatively, that any minimal probative value was outweighed by the undue consumption of time or by the substantial danger of confusing the issues or of misleading the jury, the trial court's exclusion of the specific-act evidence was not an abuse of discretion.

19

4. *Any Possible Error Would be Harmless*

Finally, even were we to find the court erred in excluding the proffered evidence, any error is harmless. As discussed, Reed was able to testify about his own experiences with violence in the Hunters Point neighborhood that explained his reaction to Ortega's conduct. But most significantly, the evidence of Reed's guilt—displayed through an unassailed surveillance video—was overwhelming. Thus, there is no reasonable likelihood the proffered specific-act evidence about the violence Reed witnessed as a child and his awareness that two people he knew had been shot in Hunters Point would have led to a more favorable result. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## C. *The Trial Court's Evidentiary Rulings Did Not Violate Reed's Right to Due Process and a Fair Trial*

Reed contends the exclusion of U.B.'s statements and the limitations on his state of mind evidence has denied him a meaningful opportunity to put on a defense. We disagree. Defendants have a federal due process right to present witnesses in their own defense, and hearsay rules may not be applied mechanistically to undermine this right. (*Chambers*, *supra*, 410 U.S. at p. 302.) Nevertheless, states have the inherent power to establish and implement "their own criminal trial rules and procedures." (*Id.* at pp. 302–303.) The California Supreme Court has held that a trial court's exercise of discretion under ordinary rules of evidence, even if erroneous, does not impermissibly infringe on a defendant's right to present a defense. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)

Because California's Evidence Code provides for the admission of hearsay statements where a party intentionally causes a witness not to testify (Evid. Code, § 1390) and because the trial court here fully considered Reed's proffered evidence to determine whether it qualified under that

exception, Reed's federal due process rights were not violated by the exclusion of that evidence.

Additionally, California law permits the exclusion of even relevant evidence where its probative value is substantially outweighed by the substantial danger of confusing the issues or misleading the jury. (Evid. Code, § 352.) Here, the court, after analyzing the proffered state of mind evidence, concluded it was not significantly probative of Reed's self-defense claim.

Finally, the court's evidentiary rulings did not impermissibly infringe on his rights to a fair trial and to present a defense; Reed was not prevented from presenting evidence from which the jury might have concluded his killing of Ortega was the result of his fear of being shot in the back. (*People v. Fudge, supra*, 7 Cal.4th at p. 1102; see also *People v. Cash* (2002) 28 Cal.4th 703, 727–728.) Indeed, Reed testified that he grew up in Hunters Point, which was a "pretty rough neighborhood" where he witnessed violence as a child. He also testified about three instances in which he personally was a victim of violence (one shooting and two stabbings). Accordingly, we conclude the court's evidentiary rulings did not violate Reed's rights to a fair trial and to present a defense.

## II. Instructional Issue

Reed next argues the trial court erred by giving CALCRIM No. 372 because there was insufficient evidence that he tried to flee. We disagree.

### A. *Additional Background*

After the close of evidence, the People requested that the jury be instructed with CALCRIM No. 372 as it was supported by substantial evidence and was statutorily required by Penal Code section 1127c. Defense counsel objected, asserting there was "simply . . . no evidence supporting

21

flight . . . simply leaving the scene is not enough." Defense counsel added there was no evidence regarding "the 14 months between the incident and his arrest." In response, the People pointed out that "on September 10, 2021, which is the one time he does come into contact with the police, he flees from them."

The court then ruled: "I think it's mandatory that the court gives this instruction. Beyond that we know from case law that a person's not required to run from the scene to appear to be making an escape. They're required to leave, to avoid arrest. [¶] And I think we have substantial evidence to give this instruction because it's an argument and it is for the jury to decide. Mr. Reed is in a pretty brutal fight and leaves Mr. Ortega on the ground not moving. Mr. Reed could have stayed since his argument is that this is self-defense. Mr. Reed could have called 911. [¶] Now, I understand that the counter to that is . . . there may be some good arguments as to why his leaving or not calling the police is no indication of consciousness of guilt or consciousness of anything. [¶] But that's for the jury to decide. And I think it is appropriate to give this instruction based on the state of the evidence in this case."

During closing argument, the People argued: "Why would you leave the scene immediately after kicking and stomping on a man? Because you know what you did is deeply wrong. [¶] . . . CALCRIM [No.] 372 tells you what you can do with that information. It's defendant's flight. It tells you that that information can show you he was aware of his guilt. He was conscious that he'd done something wrong. [¶] Now, that instruction is also very clear. You cannot use that fact alone to convict him. . . . [B]ut do you have that flight alone? No. [¶] . . . You have the video of that brutal attack. You have what he does when police finally catch up with him in September

22

2021.  And, yeah, I understand Mr. Reed's explanation is he had drugs on him.  But you can also use your common sense.  [¶] You can also evaluate is this man driving this way this dangerously—really doing it . . . because police might find drugs on him?  Or is he perhaps doing it because he knows about a year before he'd brutally beaten a man and left him in the street face down.  [¶] That flight from the police in September can be part of the evidence you look at in evaluating whether the defendant was aware in his own mind that he'd done something wrong here, that he committed a murder."

In closing, defense counsel then argued "with regards to Byron leaving the scene on July 23, 2020, I think that it is a pretty reasonable or rational response to the fact that you may have just killed somebody. . . .  [¶] I don't think Byron had any specific intricate knowledge of how the law of self-defense works.  I don't think he would sit there and say, well, I'm clearly innocent so I'll just sit here and wait for the police to arrive. . . .  [¶] Keep in mind Mr. Reed told you he doesn't even call the police when he's been the victim of a crime . . . because in his world calling the police is not something you do.  [¶] You get labelled a snitch if you're involved with the police. . . .  So he does what I think anyone in his situation would do which is I'm not gonna hang around; I'm gonna leave.  But what happens next?  For 14 months between July 2020 and September 2021, he stays in San Francisco.  [¶] . . . He's working fulltime.  He didn't flee the state right . . . .  He went about his life.  [¶] . . . When the police do try to pull him over on September 10th . . . [¶]  . . . [¶] [h]e didn't know he was wanted for a murder."  He "had some drugs in the car" and "didn't want to go to jail."

## B. *The Trial Court Did Not Err in Instructing the Jury on Flight*

"The giving of [a flight] instruction is statutorily required when flight evidence is relied upon by the prosecution." (*People v. Howard* (2008) 42

Cal.4th 1000, 1020, citing § 1127c.)[5] " 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." [Citations.] " '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 285.) "Evidence that a defendant left the scene is not alone sufficient." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

Notwithstanding statutory requirements, "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) There must be " 'substantial evidence of flight by the defendant . . . from which the jury could reasonably infer a consciousness of guilt.' " (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1245.) Thus, the evidence supporting a flight instruction can be contradicted (*People v. Richardson* (2008) 43 Cal.4th 959, 1020), and "[a]lternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury . . . to decide." (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1477.) We independently review the

---

[5] Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

trial court's finding that substantial evidence supported the instruction. (See *People v. Quiroz* (2013) 215 Cal.App.4th 65, 76.)

According to Reed, the only evidence supporting the flight instruction was the "mere fact" that he "did not remain at the scene." He claims the police chase "months after the incident" did not support the giving of the flight instruction because it "may have reflected consciousness of guilt of possessing drugs" that day, "but not consciousness of guilt regarding the incident occurring a year earlier."

Contrary to Reed's suggestion, "the instruction neither requires knowledge on a defendant's part that criminal charges have been filed, nor a defined temporal period within which the flight must be commenced . . . ." (*People v. Carter* (2005) 36 Cal.4th 1114, 1182 [defendant arrested in another state several days after charged offenses supported consciousness of guilt].) In view of the evidence that Reed immediately left the scene after brutally beating Ortega and leaving him motionless in the street and then, months later, led police on a dangerous car chase to avoid arrest, the flight instruction was warranted. (*People v. Visciotti* (1992) 2 Cal.4th 1, 60 [jury could infer defendant's flight reflected consciousness of guilt].) Even though there could have been innocent explanations for Reed's actions, under the totality of the circumstances, the jury could have reasonably inferred that Reed left the scene and later fled from police because he wanted to avoid being arrested for murder.

Assuming, arguendo, that this evidence was insufficient to require the flight instruction, we conclude that any error was harmless. Reed cursorily claims that the purported error violated his "rights under the federal and California Constitutions to due process of law and a fair trial," but our state Supreme Court has rejected that argument. (*People v. Jackson* (1996) 13

Cal.4th 1164, 1223–1224.) Rather, we review this type of error for prejudice under the state-law standard, asking whether it was "reasonably probable [the defendant] would have fared any better had the trial court not given the flight instruction." (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 502; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

We agree with the Attorney General that any potential prejudice from the purported error was minimized because of other aspects of the jury instructions. CALCRIM No. 372 itself does not assume that flight is established, instructing the jury that "*[i]f* you conclude that the defendant fled [or tried to flee], it is up to you to decide the meaning and importance of that conduct." (Italics added.) It further instructs that "evidence that the defendant fled [or tried to flee] cannot prove guilt by itself." (CALCRIM No. 372.) The jury was also instructed with CALCRIM No. 200, clarifying that some of the instructions read "may not apply, depending on [the jury's] findings about the facts of the case." Thus, the jury was informed that it had "to decide for itself" whether Reed's departure from the scene "had any relevance when deciding guilt and . . . if it decided the evidence was irrelevant, it knew to disregard the flight instruction." (*People v. Pettigrew*, *supra*, 62 Cal.App.5th at p. 502.)

Again, in light of the overwhelming evidence of Reed's guilt, there is no reasonable probability of a better result had the instruction not been given. Accordingly, Reed's claim of instructional error fails.

## DISPOSITION

The judgment is affirmed.

26

_____
DESAUTELS, J.

We concur:


_____
STEWART, P.J.


_____
RICHMAN, J.

*People v. Reed* (A168502)